*Jerrod M. Peterson v. State of Maryland*
No. 13, September Term 2014


**Criminal Procedure - Cross-Examination - Right of Confrontation - Standard of Appellate Review**. Under the rules of evidence applicable to criminal trials, a trial court has discretion to limit cross-examination to avoid confusion, prejudice, waste of time, and witness harassment; an appellate court reviewing such a decision applies an abuse of discretion standard. A trial court may also restrict cross-examination based on its understanding of legal standards of admissibility of evidence; an appellate court reviews such legal decisions without deference to the trial court. To determine, in a criminal case, whether a trial court's decisions to limit cross-examination of a prosecution witness violated the defendant's constitutional right of confrontation, an appellate court reviews whether the cumulative effect of those decisions prevented defense counsel from reaching a "threshold level of inquiry" as to that witness.

**Criminal Procedure - Cross-Examination - Factual Foundation, Proffers, and Preservation of Issue.** When a trial court sustains an objection to a line of questioning on cross-examination, counsel must make clear to the trial court the factual foundation and legal basis for the line of questioning by proffer or otherwise in order to preserve the issue for appellate review.

**Criminal Procedure - Cross-Examination - Expectation of State Witness of Benefit from Testimony with Respect to Pending Charges.** Pending criminal charges are not ordinarily admissible to impeach the testimony of a witness. A prosecution witness, however, may be cross-examined about whether the testimony is influenced by the witness's expectation of a benefit from the testimony, if there is a factual foundation for suggesting that there is such an expectation. Pending charges against the witness, in conjunction with other direct or circumstantial evidence suggesting that the witness might expect lenient treatment with respect to those charges as a result of the witness's testimony, may be the requisite factual foundation. However, defense counsel must proffer the factual foundation for the line of questioning in a timely manner in order to preserve the issue.

**Criminal Procedure - Cross-Examination - Mental Health Status.** A trial court has discretion to decline to allow cross-examination of a witness about whether possible hallucinations affected the witness's perception of a crime when the factual foundation offered for the line of questioning did not indicate that the witness had experienced hallucinations at the time of the crime. An argument that subsequent hallucinations may have affected the witness's memory of the crime is not preserved when the proffer at trial focused on the witness's perception at the time of the crime.

**Criminal Procedure - Cross-Examination - Maximum Sentence Faced by State's Witness Prior to Entering into Plea Agreement with Prosecution.** A trial court may restrict defense counsel at trial from cross-examining a prosecution witness about the maximum sentence that the witness would have faced prior to entering into a plea agreement with the prosecution when the defendant on trial is charged with identical offenses and defense counsel is permitted to cross-examine the witness at length about concessions made to the witness by the State in the plea agreement regarding charges and sentencing.

**Evidence - Attorney-Client Privilege - Criminal Law**. Questions and answers made at a proffer session between the prosecution and a criminal defendant, which was a prerequisite to a plea agreement under which the defendant would become a prosecution witness, are not privileged under the attorney-client privilege, even if the cooperating defendant's counsel is present. Absent special circumstances, however, testimony concerning the order and length of questions and other details of the proffer session are of minimal relevance at a subsequent trial at which the cooperating defendant testifies. Calling the cooperating defendant's counsel to testify about such matters creates the possibility that questioning may intrude upon matters covered by the attorney-client privilege or work-product privilege. The potential for prejudice would outweigh the minimal probative value of such testimony, particularly when it would be cumulative of the testimony of other persons who were present at the proffer session.

Circuit Court for Prince George's County
Case No. CT-090712-B
Argued: October 6, 2014

IN THE COURT OF APPEALS
OF MARYLAND

No. 13

September Term, 2014

JERROD M. PETERSON

v.

STATE OF MARYLAND

Barbera, C.J.
*Harrell,
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by McDonald, J.

Filed: July 27, 2015

*Harrell, J., now retired, participated in the
hearing and conference of the case while an active
member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section
3A, he also participated in the decision and
adoption of this opinion.

The underlying facts of this case are not complicated. The setting was a pre-arranged drug deal in Prince George's County. The two purchasers intended to steal the drugs without paying for them. The seller came with fake pills. As the ill-fated transaction proceeded inside a car, things went awry. A gun appeared and the seller was fatally shot in the driver's seat. The question at trial was whether Petitioner Jerrod M. Peterson, one of the purchasers, had pulled the trigger.

The prosecution presented the testimony of several eye witnesses – a man who had accompanied the deceased seller, the other purchaser who accompanied Mr. Peterson, the intermediary who introduced Mr. Peterson to the seller, and the intermediary's sister who was nearby when the incident took place – to prove that Mr. Peterson was the assailant. The defense attempted to create doubt about Mr. Peterson's guilt by cross-examining those witnesses about their perception and memory of the event, and their potential biases. While the trial court allowed the defense to pursue various lines of inquiry, it prohibited defense counsel from asking certain questions.

Mr. Peterson was convicted of first degree felony murder and related charges. He seeks reversal of those convictions on the ground that the trial judge unduly restricted his cross-examination of two prosecution witnesses. He asserts that the limits placed on his counsel's cross-examination not only exceeded the discretion normally accorded to trial judges, but also amounted to a violation of his right under the federal and State constitutions to confront the witnesses against him. As an additional ground for reversal, he asserts that the trial court erred when it declined, on the basis of attorney-client privilege, to allow his counsel to call to the stand the Assistant Public Defender who represented his co-defendant

(who had become a prosecution witness under a plea agreement) and question that attorney about a proffer session that her client had with the Assistant State's Attorney and police prior to entering into the plea agreement.

We hold that the limitations placed on counsel's cross-examination – to the extent that Mr. Peterson preserved an objection to them – were within the discretion of the trial judge and did not violate Mr. Peterson's constitutional right of confrontation. While the attorney-client privilege did not apply to the discussion at the proffer session, the court properly refused to allow the testimony that counsel sought to adduce as it was of minimal relevance, cumulative, and the potential for straying into privileged areas outweighed any probative value.

# I

## Background

### A.    Facts

In mid-March 2009, about one week before the shooting that is the subject of this case, Mr. Peterson was introduced to Domonique Gordon by Calvin Rose at the home of Mr. Rose's mother (where Mr. Rose resided) in Landover, Maryland. Mr. Gordon and Mr. Peterson arranged to meet at the same place during the following week in order for Mr. Peterson to purchase ecstasy pills[1] from Mr. Gordon.

---

[1] Ecstasy is the popular name for a drug otherwise known as MDMA (3,4-methylenedioxymethamphetamine) that produces feelings of exhilaration, increased libido, sensory distortion, and emotional openness towards others. Martin Blinder, *Psychiatry in the Everyday Practice of Law* 591 (4th ed. 2006). Ecstasy is a Schedule 1 controlled dangerous substance. 21 U.S.C. §812; 21 C.F.R. 1308.11(d)(11); Maryland Code, Criminal

On the appointed date, late on the evening of March 27, 2009, Mr. Gordon and his friend James McLaurin drove from Washington, D.C., to Mr. Rose's neighborhood with a bag of imitation ecstasy pills. Mr. Gordon parked in front of Mr. Rose's house and sat in the driver's seat while Mr. McLaurin occupied the front passenger seat. Mr. Rose came out of his mother's house to speak with Mr. Gordon, who emerged from the car while Mr. McLaurin remained seated within.

Mr. Peterson and his acquaintance Thomas Hughes had driven separately to the neighborhood in a car provided by Alexis Brown, a friend of Mr. Peterson who accompanied them with her four-year old son. They parked a block from Calvin Rose's house. Ms. Brown and her child remained in the car a block away, out of sight of Mr. Gordon's car, while Mr. Peterson and Mr. Hughes walked back to meet with Mr. Gordon.

Once the men were together, at Mr. Gordon's suggestion, he and Mr. Peterson got into his car, with Mr. Gordon returning to the driver's seat and Mr. Peterson taking the rear seat on the driver's side, but leaving the door open. Mr. McLaurin had remained seated in the front passenger seat. Mr. Rose and Mr. Hughes were outside in front of the car.

Shortly thereafter, a gun appeared – wielded by Mr. Peterson, according to prosecution witnesses at the trial. The three men inside the car began struggling. A shot was fired, striking Mr. Gordon inside the car. Mr. Hughes ran from the area in front of the car to the back of the car near Mr. Peterson. Mr. McLaurin got out of the car and tried to run

Law Article, §5-402, Schedule I(d)(1)(xviii). It is usually taken in the form of a capsule or tablet.

3

away, but was shot in the leg and fell to the ground. At some point during the struggle, Mr. Rose ran back into his mother's house to escape the range of fire and to call 9-1-1. The encounter in the car and the street was observed by Mr. Rose's sister, Cassandra, from a second floor window in the Rose home.

Mr. Peterson and Mr. Hughes fled back to Ms. Brown's car with the pills and money and drove off. After the two men left the neighborhood, Mr. Rose stayed on the scene of the shooting and waited for the police to arrive. He received a call on his cell phone from Mr. Peterson, who told him not to say anything to the police. Mr. Rose hung up on Mr. Peterson and gave a statement to the police about what happened. Mr. Gordon died from his gunshot wound. But Mr. McLaurin survived and spoke with an officer on the scene before being transported to a hospital.

Mr. Peterson and Mr. Hughes were arrested the next day. Mr. Gordon's wallet was later recovered from the driver's side of Ms. Brown's car.

## B.    *Charges*

A statement of charges was filed against both Mr. Peterson and Mr. Hughes in connection with the shooting on March 28, 2009. Those charges were superseded when the grand jury returned indictments on May 19, 2009, against both men charging them with several offenses related to the incidents: first degree felony murder, two counts of use of a handgun during the commission of a felony or crime of violence, assault in the first degree, robbery with a dangerous or deadly weapon, conspiracy to commit murder, conspiracy to

4

commit robbery, attempted first degree murder, and robbery. Circuit Court for Prince George's County, Case Nos. CT090712A, CT090712B.

Mr. Hughes later entered into a plea agreement with the State several months before his trial, agreeing to testify against Mr. Peterson in exchange for a sentence of 20 years' imprisonment, with all but eight years suspended.

## C. Trial

*Prosecution Case*

After numerous motions hearings and postponements, Mr. Peterson's case came to trial in mid-August 2011. The prosecution theory of the case was that, after arranging for a drug deal with Mr. Gordon, Mr. Peterson planned to rob him; that, for that purpose, he enlisted Mr. Hughes; that Mr. Peterson obtained transportation from his friend Ms. Brown and, unknown to the others, brought a gun to the meeting with Mr. Gordon; and that, during the struggle in Mr. Gordon's car, Mr. Peterson shot him from behind and before he fled back to Ms. Brown's car, also shot Mr. McLaurin.

The State presented the testimony of four witnesses to the shooting: Mr. Rose, his sister Cassandra Rose, Mr. McLaurin, and Mr. Hughes.

*Calvin Rose.* Calvin Rose testified that he had been friends with Domonique Gordon, and that he knew Jerrod Peterson from living in the same neighborhood for many years. He testified that he had introduced Mr. Peterson and Mr. Gordon to each other the week before the shooting. On the evening of March 27, 2009, Mr. Peterson called him at his home to ask if he had seen Mr. Gordon. Mr. Rose looked outside while he was on the phone. He saw Mr.

5

Gordon in a car outside his house, and informed Mr. Peterson that Mr. Gordon was there. Mr. Rose then went outside to talk to Mr. Gordon. He saw Ms. Brown's car pass by and shortly thereafter Mr. Peterson and Mr. Hughes (then unknown to Mr. Rose) walked up to them.

At Mr. Gordon's suggestion, Mr. Gordon got back into the driver's seat of the car and Mr. Peterson got in the back seat immediately behind him, but left the door open while Mr. Rose stood near the front of the car. Mr. Rose turned away from the car to speak briefly to Mr. Hughes who was standing farther away from the car. He saw Mr. Hughes' eyes widen, as though he were surprised to see something. When Mr. Rose turned to look back at the car, he realized that Mr. Peterson had a gun, and that the men in the car appeared to be struggling. Mr. Rose ran back into his mother's house to get out of the range of the gun and to protect his daughter, who was standing in the doorway. He testified that, as he reached the house, he heard a gunshot and turned to see Mr. Hughes running toward the car. Then he heard a second shot as he was calling 9-1-1 from inside the house.

After Mr. Peterson and Mr. Hughes left the area, Mr. Rose went outside and saw Mr. McLaurin laying on the ground. After the police arrived, Mr. Peterson called Mr. Rose on his cell phone while Mr. Rose was talking with a police officer on the scene. Mr. Peterson told him not to say anything to the police. Mr. Rose testified that he replied, "What the f[---] did you do? I don't even know you," and hung up. In an interview at the police station, he later identified Mr. Peterson as the man with the gun.

6

*Thomas Hughes*. According to Mr. Hughes, he met Mr. Peterson a few days before the shooting through Mr. Hughes' cousin. Mr. Peterson told him that he knew someone who sold ecstasy pills, but that he thought they could easily steal the pills instead of paying for them. Mr. Peterson asked him to obtain a gun. Mr. Hughes could not find a gun and assumed they would attempt to steal the pills without a weapon. He also thought his cousin would be participating in the theft, but when Mr. Peterson picked him up, the only other people in the vehicle were a woman and child he did not know.

Mr. Hughes testified that they drove past Mr. Rose's house and parked down the street. They walked back up the street and, when they arrived at the Rose house, Mr. Peterson entered the back seat of Mr. Gordon's car while Mr. Hughes stood outside the car with Mr. Rose. He was surprised to see Mr. Peterson brandish a gun and, when a struggle broke out in the car, he ran to the side of the car to help Mr. Peterson. He reached into the car to try to pull Mr. Peterson out, but was unable to do so. Mr. Peterson then shot Mr. Gordon. As Mr. McLaurin fled the car, Mr. Peterson shot Mr. McLaurin in the leg. According to Mr. Hughes, he and Mr. Peterson then fled back to the car in which they had come.

*James McLaurin*. Mr. McLaurin, who worked as a barber in the District of Columbia and had known Mr. Gordon for a number of years, met with Mr. Gordon on the day of the murder at his barber shop. He testified that, after drinking at the barber shop for a while, he and Mr. Gordon drove over the state line to buy more liquor at a Maryland liquor store. They then drove to Mr. Rose's neighborhood, an area unfamiliar to Mr. McLaurin. He testified

7

that Mr. Peterson entered their car and, at some point afterwards, struck Mr. McLaurin with a metal object and demanded that he "give me your money." Mr. McLaurin was dazed, but he heard a struggle in the car and a gun shot. He got out of the car, but was struck by a bullet in the right thigh and fell to the ground. He said that someone grabbed his belongings and fled while he was on the ground. He crawled back to the car, but was unable to rouse Mr. Gordon. The police arrived shortly thereafter and he was taken to the hospital.

*Cassandra Rose.* Mr. Rose's sister, Cassandra Rose, testified that she was looking out the second floor window of her home when her brother told her that the car parked in front of the house belonged to Mr. Gordon. She said that she saw two men approach the car, saw movement in the car, and heard a gunshot. She heard, but could not see who fired, the first shot. She saw the passenger (Mr. McLaurin) get out of the car and flee. "And the guy who was on the left side of the car ... reached over the car and shot."

*Other testimony.* Although she did not see the shooting, Alexis Brown testified about driving to the location with Mr. Peterson and Mr. Hughes that night, remaining in the car for 15 minutes when the two men went to their meeting, and departing after they returned with pills and money. Other prosecution witnesses included the police officers who responded to the shooting and crime evidence technicians who had collected and processed evidence from the crime scene. The technicians introduced photographs of the crime scene and items recovered at the scene that night, including money, drugs, clothing items, and bullets, as well as Mr. Gordon's wallet, which had been recovered from next to the driver's seat in the car Mr. Peterson had driven. An expert in forensic serology and DNA analysis from the county

8

crime lab and a firearms examiner testified about their examination of the recovered items and established that Mr. Peterson's DNA was found on the steering wheel of Ms. Brown's car. The deputy chief medical examiner testified concerning the autopsy of Mr. Gordon.

*Defense Case*

The defense suggested, largely through cross-examination of the State's witnesses, that Mr. Hughes was the shooter. A ballistics expert testified about ejection patterns in modern pistols and concluded that the spent casing indicated that Mr. Gordon was shot from either behind or to the side. Several friends and family members of Mr. Peterson testified as character witnesses on his behalf. The defense also called the lead detective in the case and questioned him about proffer sessions between Mr. Hughes and the State before Mr. Hughes became a witness for the State, as well as the detective's interviews of James McLaurin and Calvin Rose.

## D.      Verdict, Sentencing, and Appeal

The jury found Mr. Peterson guilty of first degree felony murder, first degree assault, robbery with a dangerous or deadly weapon, conspiracy to commit robbery, theft, and two counts of use of a handgun during the commission of a felony or crime of violence.[2]

On September 2, 2011, Mr. Peterson was sentenced to life in prison, with all but 85 years suspended and including 10 years mandatory incarceration related to the two firearms convictions.

---

[2] The jury acquitted Mr. Peterson of charges of first degree murder, attempted first degree murder, attempted second degree murder, robbery, and theft.

9

Mr. Peterson appealed.  The Court of Special Appeals affirmed his convictions in an unreported decision.  We granted a writ of certiorari to consider (1) whether certain limitations on defense counsel's cross-examination of Mr. Rose and Mr. Hughes exceeded the trial court's discretion and violated his constitutional right to confront the witnesses against him; and (2) whether the attorney-client privilege precluded the defense from calling Mr. Hughes' attorney as a witness to testify as to his proffer sessions with the prosecution.

## II

## Discussion

### A.      *Whether the Trial Court Improperly Limited Defense Cross-Examination*

Mr. Peterson points to three areas of inquiry that he argues were improperly limited by the trial court:  (1) whether Mr. Rose expected a benefit from his testimony at Mr. Peterson's trial as to pending charges against him in Virginia and Maryland, in light of an earlier agreement Mr. Rose had made to act as an informant for the Fairfax County, Virginia, police, (2) whether Mr. Hughes had experienced hallucinations affecting his testimony concerning the shooting, in light of medical records indicating that he had reported hallucinations at a later date, and (3) whether Mr. Hughes' testimony was affected by the specific potential sentence for the murder of Mr. Gordon – a charge that, as to Mr. Hughes, would be dismissed as part of his plea agreement with the State.  Mr. Peterson contends that these limitations cumulatively amounted to a violation of his right under the federal and State constitutions to confront the witnesses against him.  With respect to some of these contentions, the State asserts that defense counsel failed to adequately apprise the trial court

10

of the nature of his proposed cross-examination or that the argument that Mr. Peterson makes

to us is not the same argument made to the trial court – in other words, that he failed to

preserve at least some of these issues for appeal.

1. **Cross-Examination, the Right of Confrontation, and the Standard of Appellate Review**

It has long been recognized that cross-examination is essential to the truth-finding

function of a trial.[3]   A criminal defendant's right to cross-examine the prosecution's

witnesses is protected by the Confrontation Clause that appears in both the federal and State

constitutions.[4]  "The right of confrontation includes the opportunity to cross-examine

witnesses about matters relating to their biases, interests, or motives to testify falsely."

*Martinez v. State*, 416 Md. 418, 428, 7 A.3d 56 (2010).  That principle is incorporated in

Maryland Rule 5-616(a)(4), which provides that "The credibility of a witness may be

attacked through questions asked of the witness, including questions that are directed at: …

---

[3] The Supreme Court and this Court have recognized cross-examination as "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (quoting 5 J. H. Wigmore, *Evidence in Trials at Common Law*, §1367 (3d ed. 1940)); *Myers v. State*, 403 Md. 463, 477, 943 A.2d 615 (2008) (same).  The insight is even more ancient than the Anglo-American legal tradition.  *See* Proverbs 18:17  ("In a lawsuit the first to speak seems right, until someone comes forward and cross-examines.").

[4] The Sixth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, guarantees:  "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him."  Article 21 of the Maryland Declaration of Rights similarly provides: "That in all criminal prosecutions, every man hath a right … to be confronted with the witnesses against him; to have process for his witnesses; [and] to examine the witnesses for and against him on oath[.]"  The two constitutional provisions are interpreted *in pari materia – i.e.,* to like effect.  *Derr v. State*, 434 Md. 88, 103, 73 A.3d 254 (2013).

Proving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely." To comply with the Confrontation Clause, a trial court must allow a defendant a "threshold level of inquiry" that "expose[s] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witnesses." *Martinez*, 416 Md. at 428 (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).

Once the constitutional threshold is met, trial courts may limit the scope of cross-examination "when necessary for witness safety or to prevent harassment, prejudice, confusion of the issues, and inquiry that is repetitive or only marginally relevant." *Martinez*, 416 Md. at 428; *see also Lyba v. State*, 321 Md. 564, 570, 583 A.2d 1033 (1991). As Maryland Rule 5-611 provides, a trial court is to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Therefore, although the defendant has "wide latitude … the questioning must not be allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion." *Smallwood v. State*, 320 Md. 300, 307-08, 577 A.2d 356 (1990).

Mr. Peterson asks this Court to adopt a "two-tiered standard of review" when a defendant alleges unconstitutional limits on cross-examination. Under that approach, he argues, we should review the trial court's rulings with respect to cross-examination in his case under a *de novo* standard rather than an abuse of discretion standard. Mr. Peterson

12

primarily relies on *United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) (en banc), in which the Ninth Circuit Court of Appeals articulated the following approach to assessing claims that a trial court's restrictions on cross-examination violated the Confrontation Clause: If the defendant's challenge is based on "the exclusion of an area of inquiry," the court reviews *de novo*. If the limitation is on "the scope of questioning within a given area," the court reviews under an abuse of discretion standard. 495 F.3d at 1101.

Under this approach, the standard of review turns on how one distinguishes between what is an "area of inquiry" and what is "within an area of inquiry." In *Larson,* the court held that "the biases and motivations to lie of the Government's cooperating witnesses" constituted an "area of inquiry," and that limitations on cross-examination of those witnesses about mandatory minimum sentences were "within" that area and therefore to be reviewed under an abuse of discretion standard.[5] 495 F.3d at 1102.

The approach of the Ninth Circuit is perhaps one useful way of conceptualizing an appellate court's task in assessing a claim that a restriction on cross-examination violated a defendant's right of confrontation. However, we see no particular need to adopt it. In controlling the course of examination of a witness, a trial court may make a variety of judgment calls under Maryland Rule 5-611 as to whether particular questions are repetitive, probative, harassing, confusing, or the like. The trial court may also restrict cross-

---

[5] Under the *Larson* approach, the limitations about which Mr. Peterson complains – questions concerning maximum sentences, pending charges, and hallucinations – would all seem to fall "within an area of inquiry" and thus be subject to an abuse of discretion standard of review.

13

examination based on its understanding of the legal rules that may limit particular questions or areas of inquiry. Given that the trial court has its finger on the pulse of the trial while an appellate court does not, decisions of the first type should be reviewed for abuse of discretion. Decisions based on a legal determination should be reviewed under a less deferential standard. Finally, when an appellant alleges a violation of the Confrontation Clause, an appellate court must consider whether the cumulative result of those decisions, some of which are judgment calls and some of which are legal decisions, denied the appellant the opportunity to reach the "threshold level of inquiry" required by the Confrontation Clause. To the extent that Mr. Peterson is suggesting that we apply a *de novo* standard of review to each individual decision a trial court makes to limit cross-examination when a Confrontation Clause challenge is raised, we reject that suggestion.

## 2. The Preservation Rule and its Purpose

The Maryland Rules require that a party who objects to the admission or exclusion of evidence at trial must make the grounds for a different ruling manifest to the trial court at a time when the court can consider those grounds and decide whether to make a different ruling. In particular, to preserve an objection to the trial court's exclusion of evidence, the party must show both prejudice and that "the substance of the evidence was made known to the court by offer on the record or was apparent from the context within which the evidence was offered." Maryland Rule 5-103(a)(2). A similar requirement pertains to an objection to the admission of evidence. *See* Maryland Rule 5-103(a)(1) (in order to contest admission of evidence, party must show prejudice, a timely objection, and the specific ground, if

14

requested by the court or required by rule); Maryland Rule 4-323(a) ("An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent.  Otherwise, the objection is waived...").[6]

The preservation rule applies to evidence that a trial attorney seeks to develop through cross-examination.  While counsel need not – and may not be able to – detail the evidence expected to be elicited on cross-examination, when challenged, counsel must be able to describe the relevance of, and factual foundation for, a line of questioning.  *See Grandison v. State*, 341 Md. 175, 206-11, 670 A.2d 398 (1995).

The rules governing appellate review reflect the same principles.  "Ordinarily, the appellate court will not decide any … issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."  Maryland Rule 8-131(a).  Although this Court may "address the merits of an unpreserved issue," that discretion "is to be rarely exercised and only when doing so furthers, rather than undermines, the purposes of the rule."  *Robinson v. State*, 410 Md. 91, 104, 976 A.2d 1072 (2009); *Conyers v. State*, 354 Md. 132, 150, 729 A.2d 910 (1999).  The purposes of Rule 8-131(a) are furthered in "cases where prejudicial error was found and the failure to

---

[6] On occasion, the admission or exclusion of evidence may be the subject of a pre-trial motion *in limine*.  This Court has held that a pretrial "ruling [on a motion *in limine*] in favor of admitting evidence carries little weight with regard to evidence objections at trial.  The *in limine* ruling admitting evidence does not affect Rule[] … 4-323(a) … which ordinarily require[s] contemporaneous *general* objections at trial."  *Boyd v. State*, 399 Md. 457, 478, 924 A.2d 1112 (2007) (emphasis in original).

preserve the issue was not a matter of trial tactics." *Grandison v. State*, 425 Md. 34, 69-70, 38 A.3d 352 (2012) (quoting *Abeokuto v. State*, 391 Md. 289, 327, 893 A.2d 1018 (2006)).

The purpose of the preservation rule is to "prevent[] unfairness and requir[e] that all issues be raised in and decided by the trial court, and these rules must be followed in all cases[.]" *Grandison*, 425 Md. at 69 (quoting *Abeokuto*, 391 Md. at 327).  Put another way, the rule exists "to prevent 'sandbagging' and to give the trial court the opportunity to correct possible mistakes in its rulings." *Bazzle v. State*, 426 Md. 541, 561, 45 A.3d 166 (2012) (internal citations omitted); *see also Robinson*, 410 Md. at 103 ("Fairness and the orderly administration of justice is advanced by requiring counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.") (internal citations and quotations omitted). An appeal is not an opportunity for parties to argue the issues they forgot to raise in a timely manner at trial.  Nor should counsel "rely on this Court, or any reviewing court, to do their thinking for them after the fact." *Grandison*, 425 Md. at 70 (quoting *Abeokuto*, 391 Md. at 327).

### 3.      Cross-Examination of Calvin Rose

*Proposed Cross-Examination, Proffers, and Rulings*

A reading of the transcript reveals a zealous and talented defense attorney with a shotgun approach to objections and impeachment and a trial judge trying to maintain an orderly trial, growing impatient, and not always grasping what target the shotgun was aimed

at. The discussion of the defense effort to impeach Calvin Rose's possible expectation of a benefit in relation to pending charges offers a case in point.

*Pre-Trial Agreement*

At a pre-trial hearing in November 2010 – before a different judge than the judge who ultimately presided over the trial – the prosecution and defense had agreed that defense counsel could ask Mr. Rose whether he expected to benefit from his testimony with respect to certain charges pending against him at the time of trial – in particular, an unspecified pending charge in Prince George's County, a pending misdemeanor charge in Fairfax, Virginia, and an alleged violation of probation in Virginia.[7] The prosecutor and the hearing judge cited this Court's then-recent decisions in *Martinez v. State*, *supra.* and *Calloway v. State*, 414 Md. 616, 996 A.2d 869 (2010), as the basis for allowing the questions.

*Mistrial Motion after Opening Statement*

When the case came to trial the following year before a different judge, the agreement appeared to have broken down – or at least there were differences as to its interpretation. In opening statement, defense counsel sought to defuse the impact of the anticipated adverse testimony of Calvin Rose by advising the jury that Mr. Rose had prior convictions and also had "pending" charges. The mention of pending charges was not specifically related to a possible "expectation of benefit," although counsel did state that Mr. Rose had previously

---

[7] As explained in some detail below, the defense later sought to include questions related to a written agreement between Mr. Rose and the Fairfax County, Virginia, police department under which Mr. Rose was to act as a confidential informant. However, the agreement with the Fairfax police was not mentioned at this pre-trial hearing.

17

"work[ed] with the State" – apparently a reference to a cooperation agreement with the Fairfax County, Virginia, police. The prosecution objected at the mention of pending charges. After ascertaining from the defense counsel that he was not referring to any charges or agreements in Prince George's County, the court sustained the objection.

After opening statements had concluded, but before testimony began, defense counsel asked for a mistrial or, alternatively, to supplement his opening statement, on the ground that that the trial judge had denied Mr. Peterson due process by sustaining objections to parts of the defense opening statement, some of which related to the anticipated impeachment of prosecution witnesses. Defense counsel asked to "make a record" in connection with the mistrial motion:

| | |
|---|---|
| [DEFENSE COUNSEL]: | Judge Smith has already ruled that the burglary tool conviction is admissible. That's number one. And Your Honor didn't let me get into any of his record. Number -- and then there's a grand theft and a motor vehicle theft in Prince George's, I think from 2007 or six, and then there is a grand larceny in Virginia, maybe 2009. He has three pending charges in Virginia; one in Fairfax, one in – |
| [PROSECUTOR]: | Exactly. |
| THE COURT: | Do you believe that the law is that you can impeach with a pending charge as well? |
| [DEFENSE COUNSEL]: | It goes to -- we had lengthy discussions with Judge Smith about being allowed to ask questions of witnesses about their expectation of benefit from the State as a result of cooperating with the State on pending charges. |

18

THE COURT:                  Pending here in Maryland or pending in Virginia?

[PROSECUTOR]:               Both.

[DEFENSE COUNSEL]:          He's got three in Virginia.  Just for the record, he's got one in Fairfax pending, one [violation of probation] in Fairfax where he's facing two and a half years, and one, as we know, in Essex County, Virginia, and one in the Circuit Court in Prince George's County.  Just putting it on the record.

                            Number three, the confidential informant record, and I'm going to move that into –

THE COURT:                  The confidential informant?  What are you talking about?

[DEFENSE COUNSEL]:          He has a contract as a confidential informant with the Detectives in Fairfax.  I showed it to the State ahead of time that I was going to –

[PROSECUTOR]:               I provided it to you.

[DEFENSE COUNSEL]:          No, I showed her that that was one of the exhibits.  She saw it.  She didn't make a Motion in Limine ahead of time.  I would also say that that's admissible evidence.  And, again, it's circumstantial evidence about his experience with expecting benefits from cooperating with the State.  And that is Defense Exhibit –

[PROSECUTOR]:               What is the benefit in Virginia?

                                            * * *

THE COURT:                  It's not for the jury to see.  Do you believe that you're going to use this when you present your case?

[DEFENSE COUNSEL]:          Yes.  But, also, your Honor didn't let me mention the fact that he is a confidential informant.

19

| THE COURT: | No, I didn't. I did not. My understanding is, you cannot mention pending. And I understand what you said, it's all about what is in his mind, but we don't know what is in his mind until he takes the stand, and that's why I didn't allow you to do it. |
|---|---|

* * *

| THE COURT: | You know, it's opening statement. It's called a thumbnail sketch of what you plan to introduce in trial. I'm sure this is all – all these issues that you just mentioned are going to come up during the course of the trial. |
|---|---|
| [DEFENSE COUNSEL]: | Right. |
| THE COURT: | No doubt about it. So, based on that, I'm not going to allow you to reopen. |

*Objection to Direct Examination of Mr. Rose concerning Expectation of Benefit*

As the trial judge predicted, the issue concerning questioning Mr. Rose about whether he expected to benefit from his testimony in relation to pending charges came up later that day when Mr. Rose took the stand. This time, however, the defense objected to the testimony. When Mr. Rose testified on direct examination, the prosecutor sought, as experienced litigators often do, to anticipate and perhaps blunt the expected impeachment of the witness by questioning him about topics that might affect the jury's assessment of his testimony. In particular, she questioned Mr. Rose about his own run-ins with the law and whether he had any agreement with the State or expected any benefit from his testimony on behalf of the State. Defense counsel objected to this line of questioning, and his objections were sustained. Defense counsel thus successfully excluded Mr. Rose's testimony about

20

whether he expected a benefit as to pending charges. Whether or not this was a waiver (as the State argues), the trial court might be forgiven if it gained the impression that the defense did not view Mr. Rose's answer to whether he expected a benefit from his testimony as useful to assess his credibility.

*Cross-examination Concerning Perception, Motive, Bias, and Prior Convictions*

On cross-examination, defense counsel questioned Mr. Rose both about what he observed the night of the shooting and other matters designed to impeach Mr. Rose's credibility. He asked Mr. Rose about his role in introducing Mr. Peterson and Mr. Gordon, soliciting an admission that Mr. Rose "wasn't stupid" about why the men were meeting up, and implying that Mr. Rose was actually the one who arranged the drug transaction. He obtained an admission from Mr. Rose that he had not seen where Mr. Peterson had obtained the gun. He asked whether Mr. Rose held a grudge against Mr. Peterson for trying to break into Mr. Rose's car sometime prior to the shooting. He probed whether Mr. Rose had given inconsistent descriptions of the shooting in his 9-1-1 call and in his later statements to police and to a defense investigator. Defense counsel also obtained an admission from Mr. Rose that he had prior car theft convictions and that he was on probation in Fairfax, Virginia, for possession of burglary tools.

*Transition to Questions about Expectation of Benefit*

After obtaining admissions from Mr. Rose about his prior convictions, defense counsel then sought to pursue the same line of questioning that he had successfully objected to during direct examination. Defense counsel elicited that Mr. Rose was on probation in

21

Fairfax, Virginia, and then the following exchange occurred:

[DEFENSE COUNSEL]: Okay. And if you violated probation, you know that you can do more time –

[PROSECUTOR]: Objection.

THE COURT: Sustained. Sustained. No. No.

[DEFENSE COUNSEL]: Your Honor –

THE COURT: It's impeachment. You can use the convictions. That's it.

[DEFENSE COUNSEL]: You expect to receive – you expect to use your testimony in this case as a future benefit –

[PROSECUTOR]: Objection.

[DEFENSE COUNSEL]: – don't you?

THE COURT: Sustained.

THE WITNESS: No, sir.

At a bench conference moments later, defense counsel proffered what Mr. Rose's "testimony would have been had I been allowed to get into the probation[.]" Defense counsel listed Mr. Rose's pending violation of probation hearing in Fairfax, Virginia, and pending grand larceny charges in Essex County, Virginia, but did not mention any pending charges in Maryland. The discussion continued:

[DEFENSE COUNSEL]: We just want to ask him about his –

THE COURT: It's not admissible. Pending charges are not admissible.

[DEFENSE COUNSEL]: Right. And we believe – I'm going to shut up

22

now, I'm sorry – that the jury has a right to see his reaction, to hear his answers.

The bench conference moved on to other issues, Mr. Rose's testimony continued, and the trial ended for the day.

*Proffers after Conclusion of Testimony*

After the court dismissed the jury for the day, defense counsel asked the court to order that Mr. Rose be temporarily retained in custody in Maryland in case he needed to call him again later in trial. The court denied the request because Mr. Rose was to be returned to custody in Virginia where he was due for a court proceeding the following day.[8] Then counsel approached the bench again:

| | |
|---|---|
| [DEFENSE COUNSEL]: | … With the questions we wanted to ask about his four pending cases, so, his two pending cases in Virginia, his one pending [violation of probation]– |
| THE COURT: | Can I ask you something, [Counsel]? |
| [DEFENSE COUNSEL]: | Yes. |
| THE COURT: | What rule do you believe allows you to ask about pending cases, or that you should even make it on the record? |

---

[8] During that discussion defense counsel alluded to the fact that there might be an extant bench warrant for Mr. Rose's arrest in Maryland, apparently based on his non-appearance for a court date while he was in custody in Virginia. There was some discussion as to whether Mr. Rose would be returned to Maryland on that warrant even if released with respect to the Virginia charges. Although counsel and the court referenced the possibility of a pending charge in Maryland as part of that discussion, defense counsel did not indicate to the court that he wished to cross-examine Mr. Rose about that otherwise unspecified charge.

23

[DEFENSE COUNSEL]:   Bias and expectation of benefits.

THE WITNESS[9]:   A bias from a pending case that doesn't involve your client?

[DEFENSE COUNSEL]:   Right. Expectation of benefit.

THE COURT:   What kind of bias would that be?

[DEFENSE COUNSEL]:   To probe to see whether he has an expectation of benefit. But, Your Honor --

THE COURT:   But he has said he has no agreement with the State of Maryland. State of Maryland. We don't have any jurisdiction over Virginia in what they do. So, I'm not really clear. If, in fact, [the prosecutor] had made a call to someone in Virginia, then I could see where that would be appropriate, but that hasn't happened in this case.

[DEFENSE COUNSEL]:   I understand. Our proffer is we just want to ask him those questions about his expectation.

THE COURT:   That's not proper under the rules.

* * *

THE COURT:   But you can't ask pending.

[DEFENSE COUNSEL]:   Okay. I'm just putting that on the record.

THE COURT:   I would not allow that.

Counsel and the court went on to discuss another area of cross-examination that

defense counsel wished to pursue and then took up scheduling of witnesses for the next day

---

[9] The trial transcript attributes this statement to "the witness" – at that time, Mr. Rose. Given the context – a bench conference from which Mr. Rose was undoubtedly excluded – and the substance of the statement, we surmise that it was most likely made by either the court or the State.

24

of trial. At the conclusion of that discussion, defense counsel asked for an opportunity to proffer "the issue we forgot." For the first time since Mr. Rose took the stand defense counsel presented a written agreement between the Fairfax County police department and Mr. Rose under which Mr. Rose was to be a confidential informant. Defense counsel stated that it would be pertinent to Mr. Rose's "expectation of benefit" from his testimony in Mr. Peterson's case. The trial judge noted that it did not involve an expectation from the State of Maryland and stated that she "would have sustained any objection to you trying to get that in."[10]

*Cross-Examination with Respect to Pending Charges*

Before we address the particular argument made by Mr. Peterson, it is worthwhile to review the extent to which pending charges against a witness may – or may not – be a topic of cross-examination. Pursuant to statute and rule, the credibility of a witness may be impeached with evidence of certain types of convictions. *See* Maryland Code, Courts & Judicial Proceedings Article ("CJ"), §10-905;[11] Maryland Rule 5-609.[12] There is no

---

[10] One week later during a discussion of the prosecution's proposed cross-examination of Mr. Peterson's character witnesses, defense counsel made a comparison to his cross-examination of Mr. Rose and alluded to his effort the week before to cross-examine Mr. Rose about pending charges. Defense counsel stated that the purpose was "to probe ... his motive to falsify ... and his expectation of benefit and expectation of hope." The trial court responded that she had not allowed the inquiry because "you're only allowed to probe when you have a good faith basis [and] Mr. Rose has no agreement with [the prosecution]." This "proffer" and "ruling" came after Mr. Rose was long gone from the stand and not in the context of any effort to recall him as a witness.

[11] CJ §10-905 provides:

(continued...)

25

[11] (...continued)

(a)    Evidence is admissible to prove the interest of a witness in any proceeding, or the fact of his conviction of an infamous crime. Evidence of conviction is not admissible if an appeal is pending, or the time for an appeal has not expired, or the conviction has been reversed, and there has been no retrial or reconviction.

(b)    The certificate, under the seal of the clerk of the court, of the court in which the conviction occurred is sufficient evidence of the conviction.

[12] Rule 5-609 similarly provides:

**Rule 5-609.  Impeachment by evidence of conviction of crime.**

(a)    **Generally.**  For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party.

(b)    **Time Limit.**  Evidence of a conviction is not admissible under this Rule if a period of more than 15 years has elapsed since the date of the conviction.

(c)    **Other limitations.**  Evidence of a conviction otherwise admissible under section (a) of this rule shall be excluded if:

(1)    the conviction has been reversed or vacated;
(2)    the conviction has been the subject of a pardon; or
(3)    an appeal or application for leave to appeal from the judgment of conviction is pending, or the time for noting an appeal or filing an application for leave to appeal has not expired.

(d)    **Effect of plea of nolo contendere.**  For purposes of this Rule, "conviction" includes a plea of nolo contendere followed by a

(continued...)

26

requirement that the witness be asked about the prior conviction if the prior conviction is established during the witness's testimony by a self-authenticating public record. *See* Maryland Rule 5-616(b)(6); Levy & Hornstein, Maryland Evidence: 2015 Courtroom Manual at 205. The rule and statute are limited to final convictions and do not extend to pending charges. Thus, pending charges themselves are not admissible to attack credibility.

What is admissible, however, in the case of a witness testifying for the State in a criminal case, is whether the witness expects some benefit with respect to pending charges as a result of testimony on behalf of the prosecution. It is the *answer* to such a question that is admissible when the question is permissible under Maryland Rule 5-616(a)(4), which allows a cross-examiner to ask questions "[p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsify." *See Calloway*, 414 Md. at 637-39.

As with any question permitted by Rule 5-616(a)(4) suggesting that a witness is biased or has a motive to testify falsely, there must be a factual foundation for the question. *Calloway, supra.* The pending charges are not the impeachment evidence; rather, they are part of the factual predicate for asking the permitted question about bias or motive. But the existence of pending charges alone is not a sufficient predicate for such a question. *Id*. at 638. There must be some evidence – either direct (*e.g.,* an agreement with the prosecution to resolve charges in return for testimony) or circumstantial (*e.g.,* release of witness from

---

[12] (...continued)
    sentence, whether or not the sentence is suspended.

custody,[13] dismissal of charges,[14] a decision to forgo charges,[15] postponement of disposition of a violation of probation charge[16]) that the witness has an expectation of benefitting from the testimony with respect to the pending charges. The factual predicate for the question becomes attenuated when the charges are pending in another jurisdiction, particularly another state, or arose after the witness had provided the prosecution with the same information as contained in his testimony.

Even if there is a factual foundation to ask a witness about the witness's expectation of a benefit with respect to pending charges, a trial court may limit such questioning if "the probative value of such an inquiry is **substantially** outweighed by the danger of undue prejudice or confusion." *Calloway*, 414 Md. at 638 (quoting *Leeks v. State*, 110 Md. App. 543, 557-58, 678 A.2d 80 (1996)) (emphasis in *Calloway*). When assessing the possibility of prejudice or confusion, "the trial court is entitled to consider whether the witness's self interest can be established by other items of evidence." *Martinez*, 416 Md. at 430 (quoting *Calloway*, 414 Md. at 638). For example, in *Calloway*, this Court noted that, if it is obvious that a witness has a motive to testify in a certain way, it would be permissible to exclude a reference to a benefit from pending charges when "it is impossible to hypothesize a juror who would have (1) believed [the witness's] testimony in the absence of evidence that there

---

[13] *E.g.,Calloway v. State, supra.*

[14] *E.g. Martinez v. State, supra; Calloway v. State, supra.*

[15] *E.g., Calloway v. State, supra.*

[16] *E.g., Dionas v. State*, 436 Md. 97, 80 A.3d 1058 (2013).

28

were unrelated criminal charges pending against him at the time, but (2) rejected his testimony upon learning about those charges." 414 Md. at 639.[17]

*Whether the Factual Predicate Based on Pending Charges was Preserved for Appeal*

The discussion of the factual predicate for asking Mr. Rose about any expectation of benefit as to pending charges became somewhat confused because the topic was discussed at the same time when the defense told the jury about his prior convictions or asked him about those convictions. On more than one occasion, the trial court responded to defense counsel that "pending charges are not admissible" for impeachment – a statement that is indisputably true, as pending charges themselves are not admissible in the same way that a conviction may be for purposes of impeachment. But the defense effort, although not always clearly expressed, was to rely on pending charges as part of the factual basis for asking a question about any expectation of benefit that might influence Mr. Rose's testimony.

We turn to the particular items that Mr. Peterson contends provided a factual predicate

___

[17] In *Calloway*, the Court offered an example drawn from *Ebb v. State*, 341 Md. 578, 671 A.2d 974 (1996):

> [I]n *Ebb*, ballistics evidence established that the murder weapon was the handgun that investigating officers seized from the person of Todd Timmons. Because it was so obvious that Mr. Timmons had the strongest of motives to testify that he was not in possession of the murder weapon when the murders occurred, it is impossible to hypothesize a juror who would have (1) believed Mr. Timmons' testimony in the absence of evidence that there were unrelated criminal charges pending against him at that time, but (2) rejected his testimony upon learning about those charges.

414 Md. at 638-39.

29

for questioning Mr. Rose whether he expected to benefit from his trial testimony with respect to pending charges. It is undisputed that there was no agreement, written or oral, between Mr. Rose and the State, or other direct evidence of a benefit from his testimony. Rather, Mr. Peterson argues on appeal that there was circumstantial evidence that Mr. Rose would expect a benefit – consisting of pending charges against him in Maryland and Virginia, including a potential violation of probation charge, and a cooperation agreement he had with Virginia police in the past.

*Pending Maryland Charges*

The existence of pending charges in Prince George's County could obviously help provide a circumstantial factual foundation for asking a question on expectation of benefit. However, in the context of cross-examining Mr. Rose, defense counsel never attempted to ask him about an expectation of benefit with respect to pending Maryland charges. Indeed, the closest anyone came to asking such a question was when the *prosecutor* attempted to ask Mr. Rose whether he expected to benefit from his testimony with respect to "anything in Prince George's County." However, the defense itself successfully objected to that question and prevented further inquiry.

The defense never brought up the topic of pending charges in Maryland while Mr. Rose was on the stand. It appears that the only time defense counsel mentioned the possibility of a pending Maryland charge to the trial judge was an allusion in an argument over the mistrial motion during opening statement and in the context of a discussion of Mr. Rose's custody status – not his cross-examination – after the conclusion of his testimony and

30

the departure of the jury. It is not at all clear that defense counsel could have pointed to additional circumstantial evidence of favorable treatment by Maryland prosecutors – as was the case in *Martinez* and *Calloway* – in addition to the existence of pending charges alone. In any event, we cannot find that Mr. Peterson preserved an appellate issue with respect to questioning Mr. Rose on expectation of benefit as to pending Maryland charges when the defense itself objected to that line of inquiry.

*Cooperation Agreement with Fairfax County Police*

The closest that Mr. Peterson can claim to direct evidence of an expectation of a benefit from testimony for the prosecution was Mr. Rose's agreement to act as an informant for the Fairfax police. But, again, defense counsel never attempted to ask any questions about this agreement while Mr. Rose was on the stand. He only broached this area of examination with the court well after both the jury and Mr. Rose had departed. The judge's ruling – that she "would have sustained any objection" – was suitably hypothetical. Nor did the defense seek to recall Mr. Rose. Despite the trial judge's willingness to provide an advisory ruling, Mr. Peterson simply did not preserve this area of impeachment as an appellate issue.

Even if defense counsel had attempted to ask questions related to the Virginia informant agreement while Mr. Rose was on the stand, the judge's predicted ruling would have been appropriate in light of the cryptic information provided in the proffer. The agreement in question is with a police department in another state and, in fact, disclaims any "explicit or implicit" promises of benefit regarding any pending charges, other than that the

Fairfax police would arrange a meeting with prosecutors. Nothing in the agreement indicated any connection to the Peterson trial, or to Maryland at all. Moreover, the Virginia agreement was dated August 2010, more than a year after Mr. Rose had identified Mr. Peterson to Maryland authorities as the shooter. There was no indication that it was still in effect at the time of trial in August 2011. Even if the defense proffer of the agreement had been made while Mr. Rose was still available for questioning, there was an insufficient factual predicate for Mr. Peterson's counsel to ask questions based on that agreement.

*Pending Virginia Charges*

To the extent the defense preserved this issue at all, it was with respect to whether Mr. Rose had an expectation of benefit with respect to pending charges in Virginia. But, once again, defense counsel's clearest proffer about his intended cross-examination with respect to the pending Virginia charges came, not when Mr. Rose was on the stand, but in another context. It was only in his argument for a mistrial on due process grounds following opening statement, in which he related such questions to an "expectation of benefit" on the part of Mr. Rose from his testimony in Maryland. At that time, the court ruled on the matter at hand – the motion for mistrial or reopening of opening statement – and indicated that it would deal with issues relating to cross-examination when Mr. Rose was on the stand.

When Mr. Rose did take the stand, defense counsel cross-examined him about a wide variety of matters. After obtaining admissions from Mr. Rose as to his prior convictions, defense counsel then appeared to ask about a hypothetical future violation of probation ("And if you violated probation ...") and the use of his current testimony in that context. At

32

a bench conference, defense counsel reported to the court that Mr. Rose had a pending charge of violation of probation in Virginia, as well as a pending grand larceny charge but explained that the purpose of asking Mr. Rose about those two charges would be to allow the jury "to see his reaction, to hear his answers." Defense counsel did not relate the questioning to whether Mr. Rose had an expectation of benefit from his testimony with respect to those charges. The trial court, evidently under the impression that the defense was attempting to admit the pending charges for impeachment – as opposed to relying on them as a factual foundation for a question on expectation of benefits – stated that "pending charges are not admissible." Defense counsel only made clear that the pending charges were related to questions about bias and an expectation of benefit after Mr. Rose's testimony had been completed, the jury was dismissed, and Mr. Rose was on his way back to Virginia's custody. The defense did not ask for Mr. Rose to be recalled. At that point the trial court indicated that she would not have allowed such questioning because "you can't ask pending."

We are thus presented with circumstances where it is difficult to say that the defense actually preserved this issue at the time the witness was on the stand, but where the judge after the fact indicated that she would have refused to allow such questions simply because pending charges were involved. We need not resolve whether defense counsel adequately preserved the issue in these circumstances. Even in the after-the-fact proffer concerning the pending Virginia charges, defense counsel did not point to anything like a dismissal of charges, a decision not to charge, or a postponement of disposition of charges that was present in *Calloway*, *Martinez*, and *Dionas*. Moreover, the charges were pending in another

33

jurisdiction and there was no direct or circumstantial evidence that would suggest Mr. Rose was to receive a benefit on the Virginia charges from his testimony in Maryland. Finally, it was undisputed that, on the night of the shooting when Mr. Rose called 9-1-1 and then identified Mr. Peterson as the shooter to the police, there were no charges pending against him in Virginia. As this Court explained in *Calloway*, a court would have discretion to exclude questioning about possible bias that may be confusing or prejudicial and when the witness's self-interest may be established by other evidence that is more probative on the point. 414 Md. at 638. The defense suggested in its cross-examination that Mr. Rose identified Mr. Peterson out of personal animus that existed at the time of the crime. Even if defense counsel had preserved the issue, the trial court would have had discretion to exclude questions based on the pending charges in Virginia.

*Summary*

The ruling of the trial judge that "pending charges are not admissible" was, strictly speaking, correct. But that was not what defense counsel was attempting to do. Rather, what the defense apparently sought to ask – and the answer that might have been admissible – was whether Mr. Rose had an expectation of benefit with respect to charges pending against him at the time of his testimony. However, the proffer that made defense counsel's intention clear emerged in pieces and spurts, some of it in the context of a legal argument about a different question *before* any witness had taken the stand and much of it *after* the witness was long gone. An appellate court has the leisure to stitch together different pieces of transcript and see where the defense wished to go. It is not surprising that the trial court did not. On

34

this record, we cannot say that the defense adequately preserved the issue that it has raised on appeal as to the questioning of Mr. Rose about his expectation of a benefit.

In any event, even if it had been preserved, it is not at all clear that there was a sufficient factual foundation to ask a question concerning an expectation of benefit. Under the relevant case law, pending charges alone are not an adequate foundation and, unlike *Calloway*, *Martinez*, or *Dionas*, there was no other direct evidence (*e.g.*, an agreement with the prosecution to resolve charges in return for testimony) or circumstantial evidence (*e.g.*, dismissal of charges, nolle pros, decision not to charge, postponement of a disposition proceeding) that, in conjunction with the pending charges, would complete the factual foundation to support a question whether Mr. Rose expected some kind of leniency from the prosecution for his testimony. The defense attempted to rely on Mr. Rose's earlier agreement to act as an informant for a police department in another state, but it never asserted any connection between that agreement and Mr. Peterson's case, or even the pending charges that Mr. Rose faced in Maryland.

Finally, given the extent to which the defense was able to cross-examine Mr. Rose freely on alleged reasons he might be biased against Mr. Peterson or might shape his testimony adverse to the defendant, the defense cross-examination satisfied the "threshold of inquiry" into the witness's potential bias and motive to testify falsely.

### 4.  Cross-Examination of Thomas Hughes

Thomas Hughes was called as a prosecution witness and testified for most of one day of the trial. The vast majority of that testimony consisted of largely unimpeded cross-

examination by Mr. Peterson's counsel on topics such as:

- Mr. Hughes' unsuccessful efforts to locate a gun for Mr. Peterson

- why he said he could not find a gun when, a few months later, he knew his sister had a gun

- the circumstances of the shooting

- the fact that Mr. Hughes had been smoking marijuana "all day" on the date of the shooting

- his possession of 8 bags of marijuana and a bag of ecstasy pills on his person when he was arrested the day after the shooting

- the various charges he faced prior to entering into a plea agreement with the State

- the favorable plea deal that Mr. Hughes had obtained in return for his cooperation with the prosecution and trial testimony (including the dismissal of murder and other charges and a recommendation to limit the period of incarceration)

- that the prosecutors would assess his truthfulness in determining whether he had complied with his plea agreement

- whether he had shaped his proffered testimony to match police reports of the crime

- prior statements made in a letter sent on his behalf to the judge in his case about his drug problem

- whether he had initially attempted to enlist his girlfriend and others in a false effort to establish an alibi

- the origin of his nickname "Tommy Gun" from his days as a football quarterback

- an alleged infraction of prison rules

36

While the cross-examination was lengthy, wide-ranging, and, at least on paper, appears effective,[18] Mr. Peterson argues that the trial judge violated his right of confrontation as to Mr. Hughes by limiting that examination in two respects. First, the trial court did not allow defense counsel to ask Mr. Hughes whether he experienced hallucinations on the day of the shooting. Second, it prohibited defense counsel from questioning Mr. Hughes about the specific sentences, including life imprisonment, that he faced prior to entering into his plea agreement with the State.

*Cross-Examination about Hallucinations*

Mr. Peterson argues that the trial court erred in limiting the defense cross-examination of Mr. Hughes about hallucinations Mr. Hughes reported after his arrest. As a basis for asking such questions, defense counsel presented the trial court with three pages of handwritten medical records relating to Mr. Hughes, entitled Correctional Medical Services Inter Disciplinary Progress Notes. The notes appeared to relate to a period of time that Mr. Hughes spent at the Prince George's County Detention Center, between April 2009 – the month after the crime at issue in the trial – and March 2010.

Nothing in the three pages that defense counsel presented to the court actually indicated that Mr. Hughes had reported hallucinations near the time of the crime or his arrest. Defense counsel sought to infer that Mr. Hughes was suffering from hallucinations on the

---

[18] Eliminating pages devoted to legal argument, Mr. Hughes' testimony occupies more than 180 pages of the trial transcript, of which approximately 46 pages are devoted to the prosecution's direct examination and nearly 140 pages to the defense cross-examination.

37

night of the crime from two entries in the notes:  a notation that Risperdal[19] had been prescribed for Mr. Hughes on April 9, 2009, two weeks after the shootings, and a notation from 11 months later that Mr. Hughes was "no longer" experiencing hallucinations.  At a bench conference, defense counsel explained that, if Mr. Hughes were experiencing hallucinations at the time of the shooting, it would have affected his perception of what occurred that night.  The discussion focused on the interpretation and significance of the three pages of the medical notes, which were marked as an exhibit for identification:

THE COURT:  What is the relevance of this hallucination?

[DEFENSE COUNSEL]:  His ability to perceive and report accurately.

THE COURT:  He didn't report anything at that time to anyone, did he?

[DEFENSE COUNSEL]:  I'm just saying, in the days after he's reporting, "I, Tommy Hughes, have hallucinations."

THE COURT:  You mean that he said he was having hallucinations?

[DEFENSE COUNSEL]:  Uh-huh. That's what he was reporting.  And I want to ask him that.

* * *

THE COURT:  But he doesn't say when it started, the hallucinations.

---

[19] Risperidal is a brand name for a version of the drug risperidone, a drug that may be prescribed for schizophrenia, bi-polar disorder, and autism, among other conditions.  *See* <http://www.webmd.com/drugs/2/drug-6283-2034/risperidone-oral/risperidone-oral/details> (last visited July 2, 2015).  Defense counsel proffered to the court that it was an anti-psychotic medicine, but apparently was unable to pinpoint the reason why it had been prescribed for Mr. Hughes.

| | |
|---|---|
| [DEFENSE COUNSEL]: | Well, it's as early as April, 2009. It's as early as April, 2009. |
| THE COURT: | It says he no longer has hallucinations. That's what it says. |
| [DEFENSE COUNSEL]: | Right. But, Your Honor – |
| THE COURT: | This is a year later. |
| [DEFENSE COUNSEL]: | – we don't have the records from him reporting what he says, but he's being prescribed Risperdal. |
| THE COURT: | No. I can't – first of all, this is a year later. |

The jury was then dismissed for lunch and defense elaborated on his proposed line of cross-examination:

| | |
|---|---|
| [DEFENSE COUNSEL]: | – the authority that I wanted to do the authority for what I wanted to do – |
| | * * * |
| [DEFENSE COUNSEL]: | … It was the same case that I had cited earlier with respect to the drug use around the time of the event, and it was [*Lyba v. State*, 321 Md. 564, 583 A.2d 1033 (1991)] going to the ability to accurately perceive around the time of the event. |
| THE COURT: | He admitted it. I let you get into his drug use. |
| [DEFENSE COUNSEL]: | I'm talking about the hallucinations. |
| THE COURT: | The year later? |
| [DEFENSE COUNSEL]: | Being prescribed something – |
| THE COURT: | I know, but we don't know why he was prescribed that. We don't know – |

[DEFENSE COUNSEL]: I can proffer that Risperdal is an antipsychotic.

THE STATE: Are you –

THE COURT: But it was February, 2010, and this incident happened March, 2009.

[DEFENSE COUNSEL]: I understand. I'm not arguing. The Risperdal was prescribed April 9, 2009.

The issue was seemingly not resolved when counsel and the court also broke for lunch – or at least it appeared that defense counsel had not persuaded the judge that he had a good faith basis for asking questions about possible hallucinations at the time of the offense. When the trial resumed after lunch, defense counsel pursued a different line of cross-examination.

Nearly four hours later, after Mr. Hughes' testimony had concluded and the jury had left the courtroom, defense counsel asked to supplement the three pages of medical notes provided to the court during the discussion of the proposed cross-examination about hallucinations by attaching a fourth page. The supplement consisted of a single page entitled "Psychiatric Evaluation" dated April 9, 2009, with some indecipherable (to the appellate eye) handwriting, and largely consisting of a printed list of items with space for checkmarks – presumably part of the medical history taken from an interview with Mr. Hughes. Among the items checked was "hallucinations."[20] The only discussion by counsel and the court of this new page was as follows:

[DEFENSE COUNSEL]: Defendant's Exhibit 34 was the base file about hallucinations. I had an extra – I've shown this to

---

[20] Check marks on this page also indicated that Mr. Hughes was oriented as to "person, place, and time," was "coherent" in speech, and had a "normal" memory.

the State.  I neglected to show Your Honor that there is a checkmark for hallucinations on April 9th, whereas before I only had Risperdal on April 9th.

THE COURT:          Okay.

[DEFENSE COUNSEL]:   The State doesn't mind if I just staple it to the exhibit and ask Your Honor to consider this as part of the record –

THE COURT:          Of the original exhibit?

[DEFENSE COUNSEL]:   – per your ruling.

THE COURT:          Okay.

[DEFENSE COUNSEL]:   Thank you.

As best we can tell from the record, after the lunch break, defense counsel never renewed his effort to ask about hallucinations and, as the transcript indicates, did not request that Mr. Hughes be returned to the stand or ask the court to reconsider the issue in light of the newly-discovered fourth page of the medical notes.

Between the trial and this appeal, it appears that the focus of Mr. Peterson's efforts to ask questions about hallucinations has shifted.  At trial, defense counsel argued to the trial judge that his questions concerning hallucinations were intended to probe Mr. Hughes' *perception* of the events of March 27, 2009.  The entire discussion before the trial judge centered on Mr. Hughes' perception at the time of the shooting.

Before us, Mr. Peterson makes a different argument as to the relevance of such cross-examination – that any hallucinations would have affected Mr. Hughes' *memory* of, "or

41

ability to recall, the events of that evening."[21]  This revised argument perhaps better fits the medical notes.  Nothing in the medical notes, especially the three pages shown to the trial judge while Mr. Hughes was on the stand, indicated that the witness had experienced hallucinations on the day of the shooting – something that might affect his perception of those events.  But the medical notes, especially supplemented by the fourth page – the psychiatric evaluation – may have indicated that Mr. Hughes had experienced hallucinations sometime between April 9, 2009 (two weeks after the shooting) and the time of trial, which arguably could have affected his memory of the shooting.

This revised theory of cross-examination, like the fourth page of the medical notes, was not presented to the trial judge at the time Mr. Hughes was on the stand.  We are hard put to say that it was preserved as a basis for overturning Mr. Peterson's conviction on the ground that the trial judge failed to allow his counsel to pursue it.  A trial court is not required "to imagine all reasonable offshoots of the argument actually presented to [it] before

---

[21] Mr. Peterson asserts that, when his counsel stated that cross-examination about hallucinations would probe Mr. Hughes' "ability to perceive and report accurately," he meant to encompass memory as well as perception in that proffer.  However, as is evident in the excerpt from the transcript quoted in the text, the discussion at the bench conference focused entirely on how the report of hallucinations related to the day of the shooting and Mr. Hughes' perception.  Moreover, defense counsel cited *Lyba v. State*, 321 Md. 564, 583 A.2d 1033 (1991) as authority for his proposed cross-examination concerning hallucinations.  In *Lyba,* this Court held that the defense had a right to probe the perception of the victim of an alleged sexual assault by asking whether she had taken narcotics on the date of the incident and whether she had been drinking alcohol at a later time when she identified the defendant as her assailant.  Thus, *Lyba* concerned cross-examination of a prosecution witness about the effect of certain substances on her perception contemporaneous with the consumption of those substances.  Consistent with *Lyba,* the trial court in this case allowed Mr. Peterson's counsel to question Mr. Hughes about his use of drugs on the date of the shooting.

making a ruling on admissibility." *Sifrit v. State*, 383 Md. 116, 136, 857 A.2d 88 (2004) (holding that a proffer based on one theory of admitting evidence did not preserve more detailed, and perhaps meritorious, theory); *cf. Brecker v. State*, 304 Md. 36, 39-40, 497 A.2d 479 (1985) ("[W]hen an objector sets forth the specific grounds for his objection[,] ... the objector will be bound by those grounds and will ordinarily be deemed to have waived other grounds not specified") (alterations added).

With respect to the proffer that was actually made to the trial court – to question Mr. Hughes' perception with the suggestion that he may have been hallucinating at the time of the shooting – there is no evidence of when Mr. Hughes' hallucinations started. The medical notes only indicate that, whenever they started, they had reportedly ended by March 2010. The medical notes do not, at least to the lay person, indicate the reason why he was prescribed Risperdal or what, if any, relation that prescription may have had to hallucinations. Given the actual information provided to the trial court and the stated rationale for questioning Mr. Hughes about possible hallucinations, the trial court did not abuse its discretion in limiting defense counsel's cross-examination on that particular topic.[22]

---

[22] Mr. Peterson cites *Illinois v. Flowers*, 862 N.E.2d 1085 (Ill. App. 2007), in which the intermediate appellate court in Illinois reversed a murder conviction on the ground that the trial court improperly limited defense examination of an eye witness concerning both his mental health history and expectation of leniency from the state with respect to his own charges. It is notable that, in *Flowers*, the witness had admittedly told an investigator that he had experienced hallucinations at the time of the shooting and that the defense sought to introduce and question him about his mental health history after he denied at trial that he had experienced hallucinations on the date of the crime.

*Cross-Examination about Potential Sentence*

Mr. Hughes entered into a plea agreement with the State under which he agreed to plead guilty to a charge of conspiracy to commit robbery with a dangerous weapon – an offense that carried a maximum penalty of 20 years imprisonment – and to testify truthfully before the grand jury and at trial. In return, the State agreed to dismiss the remaining charges against him, including a first degree murder charge that carried a potential sentence of life imprisonment, and to request the sentencing court to impose a sentence of 20 years with all but eight years suspended and with credit for time served.

While defense counsel was permitted to cross-examine Mr. Hughes at length about his plea agreement and the charges he faced prior to entering into that agreement, Mr. Peterson argues that the trial court improperly limited his cross-examination about the potential sentences associated with those charges. During cross-examination of Mr. Hughes concerning his plea agreement, defense counsel established that Mr. Hughes knew that he had been indicted for first degree murder and sought to ask him about his understanding of the maximum penalty for that charge. The prosecution objected to the question on the ground that the jury should not be told the penalties associated with the charges against Mr. Peterson – which were identical to the charges originally faced by Mr. Hughes.[23] The trial judge sustained the State's objection and declined to allow inquiry into specific sentences. Nevertheless, the judge indicated that defense counsel could ask Mr. Hughes about the

---

[23] Defense counsel also indicated to the trial judge that he wished to ask Mr. Hughes about a mandatory minimum five-year sentence associated with one of the other charges that the prosecution would dismiss under the plea agreement.

specific charges and whether he understood that he faced "a lot more time" if convicted of the charges to be dismissed under the plea agreement and could identify some of the dismissed charges as felonies while Mr. Hughes had been permitted to plead guilty to a misdemeanor.

Mr. Peterson argues that this ruling was erroneous, especially because of the significance of a life imprisonment sentence.[24] This Court considered a similar argument in *Coleman v. State*, 321 Md. 586, 608, 583 A.2d 1044 (1991). In that case an eye witness, who had faced a possible sentence of life imprisonment without parole, had entered into a plea agreement under which he agreed to testify at the defendant's trial in return for a maximum sentence of 18 months. The defense cross-examined the witness extensively concerning his plea agreement and established that the witness was "well aware" of the considerably longer period of time he could have spent in prison in the absence of the agreement. The trial court, however, declined to permit the defense to ask specifically about the potential life without parole sentence. 321 Md. at 608-9.

This Court affirmed, noting that the defense's extensive cross-examination of the witness about his criminal history and plea agreement gave the jury "ample opportunity to make a reasoned determination of [the witness's] truthfulness *vel non* and of the trustworthiness of his accounting of [the victim's] murder." *Id.* at 610. Even had the witness testified that he understood he was avoiding a life sentence, in light of the other evidence brought out on cross-examination, it would have been of "minimal significance, if any at all,

---

[24] There is no dispute that this issue was preserved for appellate review.

45

and certainly would not be essential for the jury to appreciate fully the 'sweetness' of the deal made by the State to encourage him to testify." *Id*. at 611.

The reasoning in *Coleman* is consistent with that of several federal courts of appeals that have also addressed whether a defendant is entitled to cross-examine a cooperating witness about a specific sentence the witness might have received in the absence of a plea agreement. *See, e.g., United States v. Foley,* 783 F.3d 7, 18-19 (1st Cir. 2015) (when jury was aware that cooperating witness was expecting leniency as to his own sentence in exchange for his testimony, "[m]ore detail concerning the respective statutory maxima of the two crimes was neither necessary nor even particularly relevant"); *United States v. Mussare*, 405 F.3d 161, 169-70 (3d Cir. 2005) (no "categorical right" for defense counsel to ask cooperating witness about maximum penalty he could have received when defense was permitted to cross-examine about terms of plea agreement, dismissed charges, and other benefits from plea deal); *United States v. Chandler*, 326 F.3d 210, 221 (3d Cir. 2003) (holding that defense was entitled to cross-examine cooperating witnesses concerning "magnitude" of sentence reduction under their plea agreements, but declining to hold that Sixth Amendment categorically entitled an inquiry into the precise sentence that could have been imposed); *United States v. Arocho*, 305 F.3d 627, 635-37 (7th Cir. 2002) (trial court did not abuse discretion in prohibiting testimony about specific sentencing guideline ranges applicable to witnesses before and after they entered into plea agreements when defense was able to elicit sufficient information for jury to assess their credibility); *United States v. Cropp*, 127 F.3d 354, 359 (4th Cir. 1997) (holding that defendant not entitled to inquire into

46

specific sentences that cooperating witnesses might have received so long as the jury can make a "discriminating appraisal" of the possible biases and motivations of the witness) (quoting *United States v. Luciano-Mosquera*, 63 F.3d 1142, 1153 (1st Cir. 1995)).

Mr. Peterson relies primarily on the Ninth Circuit's decision in *United States v. Larson*, 495 F.3d at 1104-6. The majority in *Larson* held that the trial court abused its discretion when it precluded the defense from asking about a witness's potential mandatory life sentence. The court acknowledged that a trial court ordinarily has discretion to prohibit cross-examination regarding the potential maximum sentence that a testifying witness would have faced. *Id*. at 1106. But it reached a different conclusion when a witness would have faced a mandatory minimum sentence: "*any* reduction from a mandatory life sentence is of such a significant magnitude that excluding this information denied the jury important information necessary to evaluate [the witness]'s credibility." *Id*. at 1107.[25] The concurring opinion distanced itself from the per se rule that a mandatory life sentence is more significant than other sentences, or sentence reductions. *Id.* at 1110. The concurrence in *Larson* is more in line with *Coleman*, with the other federal circuits, and with this Court's view.

The key question is whether the jury was made aware of the witness's potential motive to testify in a particular way, including a desire for leniency in sentencing, and

---

[25] In contrast to *Larson*, which concerned cross-examination about a *mandatory minimum* sentence, Mr. Peterson's counsel attempted to question Mr. Hughes about a "maximum" penalty. On appeal, Mr. Peterson argues that his counsel actually intended to question Mr. Hughes about a "mandatory" life sentence under Maryland Code, Criminal Law Article ("CR"), §2-201(b), and analogizes his case to *Larson*. In any event, unlike the mandatory minimum life sentence in *Larson*, any portion of a life sentence under CR §2-201(b) may be suspended. *See Greco v. State*, 427 Md. 477, 505, 48 A.3d 816 (2012).

47

whether the added information about the specific sentence that the witness might have received in the absence of the plea agreement would have changed the jury's perception of the witness's credibility. In this case, Mr. Peterson's counsel thoroughly questioned Mr. Hughes concerning his plea agreement with the State. On cross-examination, defense counsel elicited that: (1) Mr. Hughes' sentencing date was scheduled for a date after he testified in Mr. Peterson's case, and depended on his testimony, (2) Mr. Hughes had been indicted for first degree murder, attempted first degree murder, conspiracy, two counts of robbery with a dangerous weapon, and two counts of use of handgun in the commission of a crime of violence, (3) Mr. Hughes' maximum sentence, under the plea agreement, was 20 years' imprisonment, with all but eight years suspended, (4) Mr. Hughes would have faced significantly more than eight years for the charges against him in the absence of the plea agreement, and (5) Mr. Hughes experienced fear when he thought about being sentenced for first degree murder.

It is evident that the trial judge carefully weighed the value of the jury knowing Mr. Hughes' specific potential sentence absent the plea agreement, with the prejudice of the jury learning of Mr. Peterson's potential sentence from a guilty verdict, and determined that the prejudice outweighed the probative value. Mr. Peterson requested a limiting jury instruction to cure any potential prejudice, but the court did not agree that a limiting instruction was enough. The judge noted that most people understand that a conviction of first degree murder may entail severe punishment, and the jury was made aware that Mr. Hughes had

48

instead pled guilty to a misdemeanor with the expectation of receiving only eight years' imprisonment.

In sum, it can hardly be said that the trial court "left the jury ill-informed about Hughes' credibility," as Mr. Peterson contends. To the contrary, the jury heard enough to make a "discriminating appraisal" of Mr. Hughes' credibility in light of the plea agreement. The jury had a clear picture of "how sweet it was" for Mr. Hughes to testify. *Coleman*, 321 Md. at 608. The trial court did not abuse its discretion.

*Summary*

Given the proffer actually made to the trial court concerning the proposed cross-examination, the trial court acted within its discretion when it restricted defense counsel from asking Mr. Hughes about hallucinations. The trial court also had discretion to limit the otherwise extensive cross-examination of Mr. Hughes about his plea agreement to avoid questions that would reveal the maximum penalties associated with the crimes with which Mr. Peterson was charged.

The significance of the trial court's rulings on these two areas of potential cross-examination must also be considered in the context of the other evidence in the case and Mr. Peterson's defense. It was undisputed that the shooting took place at or in Mr. Gordon's car[26] and that four men were present at that location at that time. Two of the men, Mr. Gordon and Mr. McLaurin, were shot. The shooter was thus either Mr. Peterson or Mr.

---

[26] The State contended that Mr. Peterson shot from inside the car; the defense presented expert ballistics testimony that suggested that the shots could also have come from just outside the car.

49

Hughes. The defense theory at trial was not that Mr. Hughes mis-perceived or mis-remembered Mr. Peterson as the shooter, or even that the plea bargain had influenced him to identify someone other than himself as the shooter.[27] The defense theory was that Mr. Hughes perceived, remembered, and knew all too well who the shooter was, and was lying to deflect blame from himself.

The trial court did not abuse its discretion in limiting the cross-examination of Mr. Hughes concerning hallucinations or the specific sentence he faced prior to his plea agreement. The extensive cross-examination of Mr. Hughes concerning his motives and potential bias more than met the "threshold level of inquiry" required by the Confrontation Clause.

## B. *Whether the Defense Was Entitled to Call Mr. Hughes' Attorney to Testify*

Over the course of several motions hearings and the trial, Mr. Peterson's counsel raised a series of issues testing the limits of confidentiality of communications involving a co-defendant who becomes a State witness and the attorney representing that witness. Mr. Hughes had been represented, with respect to the charges against him, by Bethany Skopp, an Assistant Public Defender. Mr. Peterson's counsel issued two subpoenas to her in connection with Mr. Peterson's trial. The subpoenas led to a series of discussions among counsel, Ms. Skopp, and the court over the course of several hearings and the trial concerning

---

[27] For example, defense counsel had effectively established on cross-examination that Mr. Hughes had smoked marijuana "all day" on the date of the shooting – a fact that could have affected his perception. But defense counsel never mentioned it in closing argument.

50

the admissibility of the evidence the defense sought to obtain from her. Ultimately, the trial court declined to allow Mr. Peterson to call Ms. Skopp to the stand as a defense witness on the basis that the questioning would violate the attorney-client privilege of Mr. Hughes.

The information that Mr. Peterson sought to elicit from Ms. Skopp changed over the course of the proceedings, as did the evidentiary privileges and principles that applied to each iteration. At times, there was confusion about what permutation was being raised or whether it had been resolved by the judge who had presided at the pre-trial motions hearing. While this would make for a good issue-spotting law exam question, in the end the testimony ultimately sought by the defense in its last iteration was not protected by attorney-client privilege, but also was of minimal relevance and properly excluded. Placed in the position of an after-the-fact grader of the trial court's response to the last limited thrust of defense counsel, our assessment is, in essence: right answer, wrong reason.

*The Moving Target*

At first, Mr. Peterson's counsel issued a subpoena for Ms. Skopp's notes of the proffer sessions between Mr. Hughes and the prosecution that occurred on December 7, 2009, and January 6, 2010. Ms. Skopp moved to quash the subpoena on the basis that her notes were protected from discovery under the attorney work-product doctrine. At a pre-trial hearing in July 2010, defense counsel conceded that those notes were likely protected by the work-product doctrine or attorney-client privilege, but argued that he should be permitted to review them or, alternatively, that the hearing judge should review them in camera to determine whether they could be disclosed to the defense. At that hearing, Mr. Peterson's counsel also

51

indicated that he wished to question Mr. Hughes about conversations that Mr. Hughes had with Ms. Skopp, which led to a discussion as to whether Mr. Hughes had waived the attorney-client privilege. The hearing judge agreed to review the notes in camera and deferred a determination on waiver of the attorney-client privilege until Mr. Hughes was called to the stand at trial.

Four months later, at another pre-trial hearing in November 2010, the issue was raised again. The same judge again deferred ruling on the matter until trial when Mr. Hughes would be present and could decide whether to waive a privilege and when the relevance of, and need for, the proposed evidence could be considered in the context of the other evidence at trial.

By the time the case came to trial in August 2011, a different judge had been assigned to the case. The defense effort to call Ms. Skopp as a witness appeared to have broadened beyond her notes. Shortly before the trial, Mr. Peterson's counsel served a subpoena on Ms. Skopp to appear as a defense witness at trial. Ms. Skopp filed a motion for a protective order on the ground that she had no knowledge of the facts of the case other than her communications with her client and that those communications were protected by the attorney-client privilege.

On the first day of trial, before jury selection, defense counsel raised the issue of Ms. Skopp's testimony again. The parties agreed that the judge who had presided at the motions hearings in 2010 had never resolved the issue relating to the first subpoena to Ms. Skopp for her notes. Defense counsel indicated that he now wished to question her, after Mr. Hughes

52

testified at trial, as to whether Mr. Hughes made statements at the proffer sessions that were inconsistent with his trial testimony. Unlike the discussion in the prior motions hearing, this proffer did not appear to involve asking Ms. Skopp about conversations that she and her client had in private, as both a prosecutor and police detective had attended the proffer sessions. Defense counsel conceded that "I doubt there will be anything that Ms. Skopp could provide that [the detective] couldn't provide" and noted that the detective would also be a witness at trial. In the end, defense counsel asserted that he wished to be able to call Ms. Skopp if the detective's memory failed as to the content of the proffer session. The trial judge indicated that she would not allow defense counsel access to Ms. Skopp's notes or to undertake such questioning on the ground that "[t]his is attorney-client privilege" and that the privilege had not been waived.

On the sixth day of trial, during the defense case, defense counsel revived the question of calling Ms. Skopp to the stand. On this occasion counsel made clear that his questions to Ms. Skopp about the proffer sessions would not extend to any private conversations between her and her client. The judge again expressed the view that the proposed testimony would be covered by the attorney-client privilege; the judge also pressed Mr. Peterson's counsel on what he hoped to elicit from Ms. Skopp and its relevance. Defense counsel responded that he would ask about:

> what the sequence of when the proffer was made, when the initial letter went out, how long was the proffer, was Tommy [Hughes] speaking in full sentences, was he answering in one word questions, were questions led to him, were questions or ideas given to him, what was in front of him presented by [the

53

prosecutor] ... or the Detective. And then the same type of questions with respect to the second proffer.

The Assistant State's Attorney objected to the proposed testimony on the ground of relevance and pointed out that it would be cumulative of the testimony of the detective. The court again confirmed that it would not permit Ms. Skopp to be called to the stand and appeared to rely again on the ground that such testimony would be covered by the attorney-client privilege.[28] Eventually, defense counsel called the detective as a witness and questioned him about a number of topics, including the proffer. Apart from the length of the session and the identification of those present, he apparently decided not to ask about the details he said he wanted to question Ms. Skopp about.

Thus, Mr. Peterson's effort to make Ms. Skopp a witness began with a subpoena for her notes – material that the defense conceded was protected by work product privilege. It later was supplemented by a subpoena for her to appear as a witness at trial concerning statements of her client – which clearly implicated attorney-client privilege. Eventually, Mr.

---

[28] The argument concluded with the following exchange:

Court: I'm sure if it had been [defense counsel's] client, he would want the same rights that Ms. Skopp is asserting in terms of attorney-client privilege, so I don't even know why we're going down that road again.

[Defense Counsel]: Thank you. That's a good point because it's our position that I didn't have to proffer anything to put her on the stand ... I think we have a right to just put her on the stand. But Your Honor has quashed the subpoena so that will be the end of that argument.

Peterson's counsel limited the scope of his proposed questioning of Ms. Skopp to what she heard and observed at the proffer sessions.

*Analysis*

The attorney-client privilege is a longstanding common law privilege essential to the functioning of the legal system. *Newman v. State*, 384 Md. 285, 300-3, 863 A.2d 321 (2004); *see also Zook v. Pesce*, 438 Md. 232, 240-42, 91 A.3d 1114 (2014). Consistent with the common law evidentiary privilege, the General Assembly has provided that "[a] person may not be compelled to testify in violation of the attorney-client privilege." Maryland Code, Courts & Judicial Proceedings Article, §9-108. It is left to the courts to define its contours. The attorney-client privilege "is … 'a rule of evidence that prevents the disclosure of a confidential communication made by a client to his attorney for the purpose of obtaining legal advice.'" *Newman,* 384 Md. at 302 (quoting *E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc.*, 351 Md. 396, 414, 718 A.2d 1129 (1998)). This Court has adopted Professor Wigmore's definition, which describes the contours of the privilege: "(1) Where legal advice of [any] kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection [may] be waived." *Greenberg v. State*, 421 Md. 396, 409, 26 A.3d 955 (2011) (citing *Harrison v. State*, 276 Md. 122, 135, 345 A.2d 830 (1975)) (alterations in *Greenberg*).

The testimony that defense counsel proposed to obtain from Ms. Skopp – at least in its final iteration and if carefully limited to that subject matter  – would not be protected by attorney-client privilege.  First, Mr. Peterson's counsel made clear that he did not intend to ask Ms. Skopp about any communications "made in confidence" between her and Mr. Hughes.  The testimony would have related solely to statements made by or to the prosecution – an adverse party to Mr. Hughes in his own criminal case.  In particular, defense counsel stated, "We're not going to ask her any questions about anything her client said to her outside the presence of [the prosecutor and the detective]."  Second,  the communications at issue were not made for the purpose of Mr. Hughes obtaining legal advice from Ms. Skopp.  What Ms. Skopp may have recalled about the State's questions, the length of the meeting, and how Mr. Hughes responded are not the legal advice that Mr. Hughes requested or that she provided.

The State argues this is protected disclosure to a third party consistent with disclosures to potential expert witnesses or friends, *see Newman*, 384 Md. at 306; *State v. Pratt*, 284 Md. 516, 521-24, 398 A.2d 421 (1979); *Rubin v. State*, 325 Md. 552, 566, 602 A.2d 677 (1992); *Davis v. Petito*, 197 Md. App. 487, 515-16, 14 A.3d 692 (2011).  But when a criminal defendant like Mr. Hughes discloses information to the Assistant State's Attorney prosecuting his case, that communication is fundamentally different from disclosing information to someone working on the defendant's behalf.

The State also argues that the proposed testimony would have violated Ms. Skopp's ethical duties.  The State appears to equate the attorney-client privilege with the ethical

56

obligation, under Rule 1.6(a) of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"), to maintain the confidentiality of information relating to the representation of a client.[29] However, "[t]here is a critical distinction … between confidentiality required by ethical rules and the evidentiary basis of the attorney-client privilege." *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 689, 756 A.2d 526 (2000). As this Court stated in *Newman*:

> Rule 1.6 also is not limited to "matters communicated in confidence by the client but also to all information relating to the representation," whether obtained from the client or through the attorney's independent investigation, MLRPC 1.6, cmt., whereas the attorney-client privilege only protects communications between the client and the attorney. Therefore, Rule 1.6 prohibits the disclosure of any information pertaining to the representation of a client, but does not operate to render information inadmissible at a judicial proceeding. Only communications subject to the attorney-client privilege cannot be disclosed under judicial compulsion.

384 Md. at 304-5 (internal citations omitted). Moreover, under MLRPC 1.6(b)(6), even information that is confidential under the ethical rule may be disclosed pursuant to a compulsory process, such as a subpoena. Even if the events of the proffer session were confidential for purposes of MLRPC 1.6, they were not protected by attorney-client privilege.

---

[29] MLRPC 1.6(a) provides, in relevant part:

> A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by paragraph (b).

57

Thus, we conclude that the trial court was mistaken when it excluded the proposed

testimony of Ms. Skopp – at least the last iteration of the proposal – on the ground of

attorney-client privilege. But that does not mean that it was error to exclude the proposed

testimony. Under Maryland Rule 5-403, proffered evidence may be excluded, even if

relevant, when "its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence."[30] The proffered

testimony apparently would have concerned not the substance of the proffer but the sequence

of questions, whether the participants spoke in full sentences, and similar nuances. Even if

the participants could recall such details, the probative value of such information appears to

be minimal. Moreover, it appears almost certain that Ms. Skopp's testimony would have

been cumulative. Defense counsel himself conceded during one of the motions hearings that

the proposed testimony was unlikely to cover anything not covered by the detective's

testimony.[31] Given the minimal probative value of the proposed testimony, its cumulative

[30] Although the trial court did not rule on the basis of Rule 5-403, it questioned the relevance of the proposed testimony. In these circumstances, given the proffer of the anticipated questions and defense counsel's concession that the testimony was likely to be cumulative, the underlying facts pertinent to application of that rule are essentially undisputed and we can appropriately assess whether that rule supports the trial court's decision to exclude the evidence.

[31] In the end, defense counsel cross-examined Mr. Hughes at some length and also questioned the detective about the proffers in the defense case. Their testimony did not differ materially and defense counsel did not suggest anything that Ms. Skopp's testimony would add to what the other two witnesses already said. "Where competent evidence of a matter is received, no prejudice is sustained where other objected to evidence of the same matter is

(continued...)

58

nature, and the danger that questions might well have strayed into areas covered by the attorney-client or work-product privilege, the trial court would not have abused its discretion to exclude it under Rule 5-403. *See Morris v. State*, 418 Md. 194, 223, 13 A.3d 1206 (2011) ("The former point is cumulative evidence … and so we consider it no further in our harm analysis.").

Ms. Skopp's testimony would have been cumulative and marginally relevant to the question of Mr. Hughes' credibility. Although the legal basis stated for excluding it was technically incorrect, the trial judge's instinct to resist calling a defense attorney to the stand to testify as to statements made by her client was appropriate. The trial judge properly declined to conduct what would have amounted to a discovery deposition or mini-trial on the conduct of the proffer sessions, without any stated basis for believing that anything untoward had occurred.

## III

## Conclusion

For the reasons explained above, we conclude:

(1) The defense failed to preserve the issue of whether Mr. Rose could be questioned about an expectation of benefit with respect to pending charges and, in any event, did not proffer an adequate factual foundation for such questioning.

---

[31] (...continued)
also received." *Yates v. State*, 429 Md. 112, 120, 55 A.3d 25 (2012) (quoting *Jones v. State*, 310 Md. 569, 588-89, 530 A.2d 743 (1987)).

59

(2) The defense failed to preserve the issue of whether Mr. Hughes could be questioned as to whether any hallucinations he experienced after the shooting affected his memory of the event.

(3) The defense was not entitled, as a matter of law, to cross-examine Mr. Hughes about the maximum sentence he faced prior to his plea agreement with the State when the defendant on trial had been charged with identical offenses.

(4) The limitations on cross-examination described above did not violate Mr. Peterson's right of confrontation as to Mr. Rose or Mr. Hughes.

(5) While the proposed testimony by the Assistant Public Defender assigned to Mr. Hughes about his proffer session with the prosecution was not protected by the attorney-client privilege, it was of minimal or no relevance to the issues at trial and any probative value was outweighed by the possibility that such questioning could intrude on privileged information, particularly when the defense was able to question two other participants in the proffer session.  Thus, it would not have been an abuse of discretion to preclude the questioning under Rule 5-403.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS TO BE PAID BY PETITIONER.

60