*Elwood Charles Calloway, III v. State of Maryland*, No. 202, September Term, 2022. Opinion by Eyler, Deborah S., J.

**MARYLAND RULE 5-616(a)(4) - - IMPEACHMENT OF COMPLAINING WITNESS IN CRIMINAL TRIAL BY SHOWING MOTIVE TO TESTIFY FALSELY - - FINANCIAL GAIN AS MOTIVE - - WORKERS' COMPENSATION CLAIM BY COMPLAINING WITNESS IN CRIMINAL CASE AGAINST DEFENDANT FOR BATTERY WAS NOT RELEVANT TO THIS FORM OF IMPEACHMENT.**

The appellant was charged with second-degree assault of the battery type for hitting the complaining witness with his truck after the witness, who was working loading vehicles on a ferry, refused to allow the appellant's truck to board the ferry. The witness testified that he was injured when the truck hit him and, after work the next day, went to the hospital for treatment. On cross-examination, the court sustained an objection to a question seeking to elicit whether the witness's hospital visit was paid by workers' compensation or private insurance, for lack of relevance. On appeal, the appellant challenged that ruling, arguing that the question sought to elicit information about a workers' compensation claim by the witness, which would tend to show that he had a financial motive to testify falsely.

*Held*: Judgment affirmed. This Court and the Supreme Court of Maryland recognize that, ordinarily, evidence that the complaining witness in a criminal trial brought, has pending, or is contemplating bringing a tort action or claim before the Criminal Injuries Compensation Board based on the same events underlying the criminal charge is relevant to show that the witness has a financial motive to testify falsely against the defendant. *See Martin v. State,* 364 Md. 692 (2001); *Taylor v. State*, 226 Md. App. 317 (2016); *Maslin v. State*, 124 Md. App. 535 (1999); *Hopper v. State*, 64 Md. App. 97 (1985). In these cases, the complaining witness had a personal financial interest in those claims that was tied to the events in the underlying criminal case and would be advanced or protected by giving testimony against the defendant sufficient to result in a conviction.

In the case at bar, to convict the appellant of criminal battery the State was required to prove that he engaged in offensive physical contact or harm to the complaining witness and that the contact was the result of an intentional or reckless act and was not accidental. To prevail in a workers' compensation claim based on the same events, however, the complaining witness merely had to show that he sustained an injury caused by the willful or negligent act of a third party directed against him in the course of his employment. Labor and Employment Article, § 9-101(b)(2). Unlike the cases in which there was a financial motive for the complaining witness to testify against the defendant, here the complaining witness would be entitled to workers' compensation benefits even if the appellant did not act intentionally or recklessly, but only negligently; and regardless of whether the appellant

was convicted. In addition, there was no basis for the appellant's argument below, that evidence that the witness's hospital visit was paid by workers' compensation was relevant to impeachment because it could show that he was feigning an injury. The evidence would tend to show the opposite: that he was injured, not that he was feigning injury.

Circuit Court for Wicomico County
Case No. No. C-22-CR-21-000340

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 202

September Term, 2022
_____

ELWOOD CHARLES CALLOWAY, III

v.

STATE OF MARYLAND
_____

Beachley,
Shaw,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed:  June 28, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland.  The name change took effect on December 14, 2022.

This appeal stems from an incident that occurred on April 11, 2021, when Raymond Hoffman, an employee of the Wicomico County Department of Public Works, was loading vehicles on the "Upper Ferry" at the Wicomico River. Mr. Hoffman refused to permit Elwood Charles Calloway, III, the appellant, to board his pickup truck on the ferry. An altercation ensued. Ultimately, a jury in the Circuit Court for Wicomico County found the appellant guilty of second-degree assault, of the battery type, against Mr. Hoffman. The court sentenced him to 18 months, all but four months suspended, to be served on home detention, in favor of two years' probation.

The appellant asks whether "the trial court err[ed] and/or abuse[d] its discretion in preventing defense counsel from questioning Mr. Hoffman about his worker's [sic] compensation claim?" We shall affirm the judgment.

## FACTS AND PROCEEDINGS

A one-day trial was held on March 30, 2022. The State called Mr. Hoffman and Travis Waters, an independent witness.

Mr. Hoffman testified that on the day in question he was loading vehicles on the Upper Ferry, which has a weight limit of 10,000 pounds. The ferry was docked, and vehicles entered on it from a ramp. After Mr. Hoffman loaded Mr. Waters's Volkswagen, the appellant drove his pickup truck up to the stop sign at the edge of the ramp. When Mr. Hoffman told the appellant he could not board his truck on the ferry because it was

overweight, the appellant became "irate."[1]  A shouting match followed during which Mr. Hoffman rejected a weight ticket for the truck and told the appellant that before the truck would be allowed on the ferry, he would have to have it weighed, suggesting the County dump, which is free.[2]

Mr. Hoffman walked down the ramp toward the inside of the ferry.  When he "got halfway between the ramp and … the pilot house[,]" he heard the appellant "rev his engine up" and start to drive his pickup truck onto the ferry.  He "heard the concrete" and felt the ferry "jump up and down[.]"  When he turned around, the appellant "was right there on" him and "hit" him with the front of the truck.  He was forced backwards 1 or 1 1/2 steps and then the defendant "threw on [the] brakes."  Mr. Hoffman "backed off and went towards the ferry house[.]"  At that point, Mr. Waters, who had been waiting in his Volkswagen on the ferry, "got out of his vehicle[,]" approached the appellant, and "asked him to get off the ferry."

Mr. Waters testified that his Volkswagen had been loaded on the ferry and he was sitting inside it with his two children, ages 12 and 10.  When he heard words being exchanged, he looked in his rearview mirror.  He saw the appellant's pickup truck "move forward" and Mr. Hoffman "kind of come back a little bit, and then he had his hand on the hood."  From this, Mr. Waters deduced that the appellant had hit Mr. Hoffman with the

---

[1] Mr. Hoffman could tell from the make, model, year, and size of the pickup truck that it exceeded the 10,000-pound weight limit.

[2] Mr. Hoffman rejected the weight ticket because it was from Salisbury Steel, a company he knew had been closed for four or five years.

2

front of his truck, causing him to move backward. Mr. Waters exited his Volkswagen and walked up to the two men. The appellant was saying that Mr. Hoffman "had banged his hood[.]" In Mr. Waters's view, that version of events did not "correlate to" what he had seen in his rearview mirror. The appellant did not want to leave and kept insisting that his truck be allowed on the ferry. Mr. Waters made clear that his children were waiting, and he wanted the ferry to leave.

The appellant testified on his own behalf. He agreed that he had become upset when Mr. Hoffman refused to allow his truck on the ferry. After they "argued" for a while, Mr. Hoffman "started walking back to the ferry booth[,]" which is inside the ferry. When Mr. Hoffman got to the ferry booth, the appellant "pulled [his] front wheels onto the ferry[.]" Mr. Hoffman came "back out of the booth and put his hand on [the appellant's] truck and said stop, you can't get on." The appellant got out of his truck, and he and Mr. Hoffman resumed arguing. At that point, Mr. Waters approached and said he was "trying to get somewhere[,]" so the appellant drove off. The appellant denied striking Mr. Hoffman with his vehicle and insisted that the sole contact between his truck and Mr. Hoffman was Mr. Hoffman's putting his hand on the truck's hood.

The jury deliberated for 48 minutes and returned a guilty verdict.

## DISCUSSION

### Facts Related to the Issue

On direct examination, Mr. Hoffman testified that the front of the appellant's truck hit him in the chest, knee, and lower abdomen. The incident happened late in the day, and he continued working for a short time until closing. After work the next day, he went to

3

the emergency room and underwent tests. His chest was bruised internally, and he was referred to an orthopedic surgeon for what turned out to be a torn ligament in his right knee.

The State moved Mr. Hoffman's medical records from the emergency room visit into evidence.[3] The first page bears an entry identifying Mr. Hoffman's "primary insurance" as "workers compensation" and his "secondary insurance" as Blue Cross Blue Shield. Two additional entries state that Mr. Hoffman's primary insurance coverage was "workers compensation." Mr. Hoffman testified that he expected to have surgery on his right knee in May or June 2022.

On cross-examination, defense counsel reestablished that Mr. Hoffman had visited the emergency room the day after the incident, and then asked:

> [DEFENSE COUNSEL]: … Okay. Do you remember if you were claiming this as a workmen's [sic] compensation issue or you were using your own insurance or?
>
> [MR. HOFFMAN]: It's a workmen's [sic] - -
>
> [PROSECUTOR]: Objection, Your Honor.
>
> THE COURT: Approach.

At the bench, the prosecutor argued that whether Mr. Hoffman had filed a claim for workers' compensation was not relevant. When the court asked defense counsel to respond, he said:

> I would argue it's very relevant, seeking, if he got benefits as a result of making a workmen's [sic] compensation report, I would argue that creates evidence of a motive to lie, making up going to the hospital and things like that.

---

[3] No other medical records were admitted in evidence.

4

The court sustained the objection, granted a motion to strike, and instructed the jury to "disregard the last question and any potential answer to it."

## Contentions

The appellant contends defense counsel's question about workers' compensation to Mr. Hoffman was relevant to whether Mr. Hoffman had a motive to testify falsely. He analogizes to four Maryland cases holding that in a criminal trial, evidence of a related civil action by the complaining witness against the defendant, or of a claim by that witness before the Criminal Injuries Compensation Board ("CICB"), tends to show the witness has a pecuniary interest that furnishes a motive to lie. He maintains that the court's ruling violated his constitutional right of confrontation and Rule 5-616(a)(4), and that the error was not harmless beyond a reasonable doubt because Mr. Hoffman's credibility was the central issue in the case.[4]

The State counters that a claim for workers' compensation is not a tort action, and any recovery of workers' compensation benefits would not depend upon proof of a criminal act. It asserts that the appellant has not shown how the verdict against him bore any relation to Mr. Hoffman's pursuit of workers' compensation benefits, nor has he shown that Mr. Hoffman's filing a workers' compensation claim would motivate him to "falsely implicate [the appellant] in a criminal assault." It argues that the four cases the appellant relies upon are distinguishable and cites several out-of-state cases to support its position. Finally, in

---

[4] Rule 5-616(a)(4) provides that "[t]he credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at … (4) [p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]"

5

answer to the appellant, the State asserts that any error was harmless beyond a reasonable doubt.

### Relevant Maryland Workers' Compensation Law

Some provisions of the Maryland Workers' Compensation Act ("the Act"), Title 9 of the Labor & Employment Article ("LE") of the Maryland Code (1999, 2016 Repl. Vol.), bear on our analysis. The well-established purpose of the Act is "to protect workers and their families from the hardships inflicted by work-related injuries." *Edgewood Nursing Home v. Maxwell*, 282 Md. 422, 426 (1978).

The Act affords workers' compensation to a claimant employee "for an accidental personal injury" sustained by the employee "regardless of fault, as to a cause of the accidental personal injury."[5] LE § 9-501(a)(1), (b). Most commonly, an "accidental personal injury" is one that "arises out of and in the course of employment[.]" LE § 9-101(b)(1). To prevail, the claimant must show the injury 1) resulted from engaging in work required by or incidental to the employment, *see Livering v. Richardson's Rest.*, 374 Md. 566, 574 (2003), and 2) was sustained in the course of the employment, which concerns "the time, place, and circumstances of the accident in relation to the employment." *Montgomery Cnty. v. Wade*, 345 Md. 1, 11 (1997). Less commonly, but applicable here, the accidental personal injury can be "an injury caused by a willful or

---

[5] The employee must be a "covered employee," which "means an individual listed in Subtitle 2 of this title for whom a person, a governmental unit, or a quasi-public corporation is required by law to provide coverage under this title." LE § 9-101(f). The Act also provides compensation to survivors for work-related deaths. LE § 9-501(a)(2). For ease of discussion, we shall refer to covered employees as employees.

negligent act of a third person directed against" the employee "in the course of" his employment. LE § 9-101(b)(2).[6] In that situation, the claimant need not prove that the injury arose out of the employment but must show that it happened in the course of the employment. For example, in *Edgewood Nursing Home, supra*, the Court held that workers' compensation applied when an employee was killed at work by her paramour. Even though the death was motivated by personal reasons "not attributable to the working environment," it occurred "within the course of employment on the employer's premises" when the employee was required to be there. 282 Md. at 430.

The various types of workers' compensation benefits an employee may receive are enumerated in Subtitle 6 of the Act. Some benefits take the form of compensation paid to the employee for periods and levels of disability, including temporary partial, temporary total, permanent partial, and permanent total. *See* LE §§ 9-614 – 9-642. The Act also requires the employer to provide "medical services and treatment[,]" including medical and surgical attendance and treatment, hospital and nursing services, and medications, all for the period required by the nature of the accidental personal injury. LE § 9-660(a), (b). The payments for those medical services and treatment are remitted directly to the billing health care providers by the employer (or the employer's insurer). LE § 9-660(d).

An employee who is injured by a third person's willful or negligent act "for which compensation is payable[,]" may file a workers' compensation claim against the employer or bring a tort action for damages against the third party. LE § 9-901(1), (2). If the

---

[6]An "accidental personal injury" also can be a statutorily identified occupational disease or condition. *See* LE § 9-101(b)(3).

7

employee files a workers' compensation claim and compensation either is awarded or paid, for two months thereafter the employer has the exclusive right to sue the third-party tortfeasor for damages. LE § 9-902(a), (c). After two months, the employee and employer have the concurrent right to bring such an action. *See Anne Arundel Cnty. v. McCormick*, 323 Md. 688, 692 (1991). The Act controls how damages recovered in such a tort action are to be distributed, but the recovery first must be applied to reimburse the employer for any workers' compensation paid or awarded. *See* LE § 9-902(b), (e)-(g); *see also Bd. of Educ. of Prince George's Cnty. v. Marks-Sloan*, 428 Md. 1, 48 (2012).

## Maryland Cases

As noted, the appellant argues that four Maryland cases are sufficiently analogous to the case at bar to support his position on appeal.

In *Hopper v. State*, 64 Md. App. 97 (1985), the complaining witness at the defendant's trial for assault with intent to murder testified that he and the defendant had a one-night sexual encounter, for which he paid the defendant. He then agreed to allow the defendant to stay with him an additional night if there were no sexual activity. When, during that night, he refused to have sexual relations with the defendant, the defendant became angry and cut him with a knife. The defendant testified, to the contrary, that the two men spent three days at the witness's apartment engaging in sexual activity, for which the witness had agreed to pay; and when the witness reneged, they wound up in a tussle during which he accidentally cut the witness with his knife. Before trial, the complaining witness filed a claim with the CICB that was denied under the "family crime" exclusion, which made a victim of a crime committed by a "family member" ineligible for

8

compensation. The definition of "family" included "any person maintaining a sexual relationship" with the perpetrator. Md. Code (1957, 1984 Cum. Supp.), Article 26A, §§ 2(d)(2), 5(b).[7] The witness wrote to the CICB, denying that he had been maintaining a sexual relationship with the defendant. On that basis, the CICB reconsidered its decision and granted the witness an award of $2,698.19.

On cross-examination of the complaining witness, defense counsel established that, in the witness's letter to the CICB, he described the defendant as an "overnight guest" and suggested that he only stayed at his apartment for one night. 64 Md. App. at 102. When defense counsel started to ask "were you told that you would not be entitled to receive benefits if your injury –" the court sustained an objection. *Id*. at 103. Defense counsel argued that the witness had a financial interest that would motivate him to testify falsely: "If he were to testify that [the defendant] had been over there and had sex more than once, he is imperiling his award." *Id*. at 102. He proffered the contents of two exhibits that showed that the witness's claim before the CICB was granted "on the basis that he 'was the victim of a set up by a psychotic killer … and that the limited sexual encounter did not cause nor contribute to the infliction of the [witness's] injury.'" *Id*. at 103 n.3. On appeal, we vacated and remanded, concluding that the trial court had erred by curtailing the cross-examination because the facts defense counsel was seeking to elicit from the witness were relevant to "the witness' possible motivation to fabricate his testimony." *Id*. at 106.

---

[7] The present statute, Md. Code (2001, 2018 Repl. Vol.), Criminal Procedure Article, § 11-808, does not include such an exclusion.

9

In *Maslin v. State*, 124 Md. App. 535 (1999), we held that in a trial on charges of child sexual abuse, the court erred by not permitting cross-examination of the complaining witness about his pending tort action against the defendant. The witness told the police the defendant had sexually abused him when he was a child. At their request, he participated in a sting operation, during which the defendant hugged him. That hug became the basis of the witness's civil suit for battery against the defendant.[8] We observed that, at the criminal trial, "the evidence of the civil lawsuit was relevant to establish a potential source of bias, as well as a motive to testify falsely[,]" and "a jury could consider the pending … lawsuit as evidence that [the witness] had a significant financial stake in the outcome of the criminal proceedings." *Id*. at 541. To make out a case for civil battery, the witness would have to prove that the touching was an "offensive contact." Ordinarily, a hug would not suffice but if the defendant had sexually abused the witness when he was a child, a factfinder reasonably could find that a hug from him was offensive. Because testimony by the complaining witness that the defendant had committed acts of child sexual abuse against him would make it more likely that he would prevail in his civil action against the defendant, information about the civil case would reveal that the witness had a financial motive to testify falsely that could be important to the jury in assessing his credibility.

In *Martin v. State*, 364 Md. 692 (2001), the Court extended our holding in *Maslin* to a circumstance in which the complaining witness was contemplating filing a civil action against the defendant but had not yet done so. The defendant, a former police officer, was

---

[8] The statute of limitations had run on any civil actions arising out of the child sexual abuse itself. *Maslin*, 124 Md. App. at 541-42.

10

on trial for stealing cash from the witness while on duty. The trial court barred defense counsel from cross-examining the witness about whether he had hired a lawyer to sue the police department that had employed the defendant. The Court held that the ruling was an abuse of discretion because evidence that the witness was looking into bringing a civil suit based on the same events was just as relevant to his credibility as evidence that a suit was pending.

Finally, in *Taylor v. State*, 226 Md. App. 317 (2016), in the defendant's trial for sexually abusing several children, the trial court precluded defense counsel from cross-examining the children's mothers about whether they had spoken to an attorney about bringing civil actions based on the incidents. The ruling was not based on relevancy but on the subject of the question being beyond the scope of direct examination. We reversed on other grounds but addressed the court's preclusion ruling for guidance on remand. We observed: "From the mere pursuit of a lawsuit, jurors may infer that the witness has 'feelings of animosity' towards the accused or that the witness has 'a significant financial stake in the outcome of the criminal proceedings.'" *Id*. at 378 (quoting *Maslin*, 124 Md. App. at 541). We concluded that the trial court abused its discretion by adopting an inflexible rule that would not permit cross-examination on an issue affecting the credibility of the child victims.

### Out-of-State Cases

The State maintains that the cases the appellant relies upon are distinguishable and brings our attention to cases from Texas, Alabama, and Virginia.

11

In *Deloney v. State*, 734 S.W.2d 6 (Tex. Ct. App. 1987), at the defendant's trial for aggravated robbery, defense counsel sought to ask the complaining witness whether a photograph depicting injuries he sustained during the robbery had been taken to support "a workers' compensation claim allegedly filed by [the witness]." *Id*. at 9. The court granted the prosecutor's objection based on relevance. On appeal, the court acknowledged that "[g]enerally, a defendant is permitted to show that the complaining witness has brought a civil suit for damages based on the same occurrence for which the defendant is being prosecuted." *Id*. It distinguished that from a workers' compensation claim, emphasizing that it is not a civil action or an action by the witness against the defendant and that the defendant's "guilt or innocence [in the criminal case] is wholly unrelated to the success of" the complaining witness's workers' compensation claim. *Id*. Because "the mere existence of the collateral [workers' compensation] action did not indicate any improper motive, bias, or prejudice on the part of the [witness] in testifying against" the defendant, the trial court's ruling was not an abuse of discretion. *Id*.

In *Stokes v. State*, 612 So. 2d 1330 (Ala. Crim. App. 1992), the defendant was on trial for attempted rape of the complaining witness, a housekeeper, at the motel where she worked. After evidence was elicited, without objection, that the witness had filed a workers' compensation claim, the trial court precluded defense counsel from cross-examining her about the specifics of the claim. The defendant challenged that ruling on appeal, arguing that details of the workers' compensation claim were relevant to show bias. Upholding the trial court's ruling, the court stated: "Whether the [defendant] was found guilty or not guilty of attempted rape would not affect the victim's claim for benefits

12

under worker's compensation." *Id*. at 1333. Recognizing that what is relevant may vary with the circumstances, the court admonished that its opinion "should not be construed to limit the admissibility in all situations where a witness is cross-examined concerning filing a worker's compensation claim." *Id.*

The State contrasts these cases with *Barker v. Commonwealth*, 337 S.E.2d 729 (Va. 1985), where the defendant was charged with raping the complaining witness inside her apartment. The trial court precluded defense counsel from questioning the witness about "her worker's compensation claim which was based on the theory that she met [the defendant] in the course of her employment as a credit manager." *Id*. at 733. Reversing, the Supreme Court of Virginia explained that the proposed cross-examination was relevant to motive to fabricate. Under Virginia law, because the rape was committed in the witness's apartment, the complaining witness needed to tie the crime to her employment to receive workers' compensation benefits. By accusing someone like the defendant, whom she had met through her employment, she could attempt to do so. *Barker* differed from *Deloney* and *Stokes*, where there was no dispute that the complaining witnesses suffered their injuries at their places of work and therefore the same motive to testify falsely did not exist.

**Analysis**

The right of confrontation guaranteed by the Sixth Amendment to the federal constitution serves "'[t]he main and essential purpose … *to secure for the opponent the opportunity of cross-examination.*'" *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)

13

(quoting 5 J. Wigmore, *Evidence* § 1395, at 123 (3d ed. 1940)) (emphasis in original).[9] "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316. "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316-17. "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Id.* at 316 (quoting 3A J. Wigmore, *Evidence* § 940, at 775 (Chadbourn rev. 1970)).

"Compliance with our federal and state constitutions requires the trial judge to allow the defense a 'threshold level of inquiry' that puts before the jury 'facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'" *Manchame-Guerra v. State*, 457 Md. 300, 309 (2018) (quoting *Martinez v. State*, 416 Md. 418, 428 (2010)). To "ensure the right of confrontation, defense counsel must be afforded 'wide latitude to cross-examine a witness as to bias or prejudices.'" *Id.* (quoting *Martinez*, 416 Md. at 428). Nevertheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

---

[9] The confrontation right (with an exception not applicable here, *see Leidig v. State*, 475 Md. 181, 234-41 (2021)) afforded by Article 21 of the Maryland Declaration of Rights has been interpreted to be coextensive with the federal right. *See*, *e.g.*, *Smallwood v. State*, 320 Md. 300, 306 (1990).

14

It follows that the Confrontation Clause does not alter the general rule that "[a] trial court does not abuse [its] discretion when it excludes cross-examination that is irrelevant." *Simmons v. State*, 392 Md. 279, 296 (2006) (citing Md. Rule 5-402). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. "Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible[,]" but "[e]vidence that is not relevant is not admissible." Md. Rule 5-402. "While trial judges are vested with discretion in weighing relevancy in light of unfairness or efficiency considerations, trial judges do not have discretion to admit irrelevant evidence." *State v. Simms*, 420 Md. 705, 724 (2011).

The threshold question, therefore, is "whether the evidence is legally relevant," that is, does it have any probative value within the meaning of Rule 5-401. *Id.* at 725. We review that question *de novo*. *See Kazadi v. State*, 467 Md. 1, 49 (2020) (reviewing "without deference a trial court's restriction of cross-examination where that restriction is based on the trial court's 'understanding of the legal rules that may limit particular questions or areas of inquiry'" (quoting *Peterson v. State*, 444 Md. 105, 124 (2015)). *See State v. Robertson*, 463 Md. 342, 353 (2019) (noting that relevance is a legal question reviewed under a *de novo* standard); *Fuentes v. State*, 454 Md. 296, 325 (2017) (same). If in addition to that threshold question, the court made "a variety of judgment calls under Maryland Rule 5-611 as to whether particular questions [on cross-examination] are repetitive, probative, harassing, confusing, or the like[,]" we review those decisions for

15

abuse of discretion. *Peterson*, 444 Md. at 124.[10] As to the Confrontation Clause, we "must consider whether the cumulative result of those decisions, some of which are judgment calls and some of which are legal decisions, denied the appellant the opportunity to reach the 'threshold level of inquiry'" that is constitutionally guaranteed. *Id.*

As noted, Rule 5-616(a)(4) permits a witness's credibility to be attacked through questions to the witness, "including questions that are directed at . . . [p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive

---

[10] Rule 5-611 states:

(a) **Control by court.** – The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

\* \* \*

(b) **Scope of cross-examination. –**

(1)  Except as provided in subsection (b)(2), cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.  Except for the cross-examination of an accused who testifies on a preliminary matter, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

(2)   An accused who testifies on a non-preliminary matter may be cross-examined on any matter relevant to any issue in the action.

(c) **Leading questions.** – The allowance of leading questions rests in the discretion of the trial court.  Ordinarily, leading questions should not be allowed on the direct examination of a witness except as may be necessary to develop the witness's testimony.  Ordinarily, leading questions should be allowed (1) on cross-examination or (2) on the direct examination of a hostile witness, an adverse party, or a witness identified with an adverse party.

16

to testify falsely[.]"  The impeachment genre in the case at bar is motive to testify falsely. In a jury trial, questions designed to elicit this type of impeachment evidence should be permitted unless they lack a factual foundation, or their probative value is substantially outweighed by the danger of undue prejudice or confusion of the jury. *Calloway v. State*, 414 Md. 616, 623, 639 (2010); *Leeks v. State*, 110 Md. App. 543, 557-58 (1996). Nevertheless, if the evidence sought to be admitted is not relevant to the witness's credibility, *i.e.*, it lacks probative value for impeachment, it should not be admitted. *Simms*, 420 Md. at 724 (observing that, "[w]hile trial judges are vested with discretion in weighing relevancy in light of unfairness or efficiency considerations, trial judges do not have discretion to admit irrelevant evidence").

We agree with the State that the cases the appellant relies upon are distinguishable. In all four, the complaining witnesses (or their mothers, for those who were minors) either had brought or were considering bringing claims that would benefit them financially *only* if their testimony in the related criminal trials incriminated the defendant.  The witness in *Hopper* would keep his financial award from the CICB if he testified that the defendant cut him intentionally, not accidentally, and spent just one night with him.  If he testified otherwise, he risked losing the award.  In *Maslin*, to be awarded damages in his pending civil action for battery against the defendant, the complaining witness needed to testify, in the criminal case, that the defendant had sexually abused him when he was a child.  He could not testify to the contrary in the criminal case and hope to prevail in the civil case. Likewise, for the complaining witnesses in *Martin* and *Taylor* to succeed in future civil actions against the defendant's former employer or the defendant, they needed to testify

17

that the defendants committed the wrongs at the heart of the charges against them—stealing cash and committing acts of sexual abuse. In all the cases, the testimony the defense was seeking to elicit would show that the complaining witness had a personal financial interest tied to the events underlying the charges that would be advanced or protected by giving incriminating testimony against the defendant. The financial interest of each complaining witness served as a motive to testify falsely against the defendant, making it highly relevant to the witness's credibility.

In *Deloney, Stokes,* and *Barker*, the appellate courts' decisions also were driven by whether there was an interdependency between the complaining witness's workers' compensation claim and the criminal case against the defendant that would motivate the witness to testify falsely. Those courts recognized that if factual linkage between the complaining witness's workers' compensation claim and the crime the defendant was being tried for supplied a financial motive for the witness to testify falsely, evidence about the claim was relevant to credibility. That was the case in *Barker*, where the witness could prevail in her workers' compensation claim only by showing that the crime was committed by someone she knew through her work. Given that the defendant fit that bill, the witness had a financial motive to testify that he was the person who committed the criminal acts against her, even if he was not. In *Deloney* and *Stokes*, where the complaining witnesses would receive workers' compensation benefits *regardless of the substance of his testimony in the criminal case*, the existence and/or details of their workers' compensation claims were not relevant impeachment evidence. In those cases, the complaining witnesses had

18

no need to falsely incriminate the defendants to succeed in their workers' compensation claims and therefore their testimony would not be motivated by a financial interest.

We return to the case at bar. The sole question posed by defense counsel, made in reference to Mr. Hoffman's emergency room visit, was whether he was "claiming this as a work[ers'] compensation issue" or was "using [his] own insurance …?" Defense counsel did not proffer what he expected Mr. Hoffman to say in response. Nevertheless, it was apparent from the context of the question, together with the already-admitted hospital record documenting that his primary insurance was workers' compensation and his secondary insurance was Blue Cross Blue Shield, that Mr. Hoffman would have answered that he had made a claim for workers' compensation to cover his medical expenses, including the emergency room visit. *See* Md. Rule 5-103(a)(2).

That claim depended upon proof that Mr. Hoffman had sustained an "accidental personal injury" under LE § 9-101(b)(2), that is, an injury caused by a willful or negligent act directed against him by the appellant and occurring in the course of his employment. As to the latter, the evidence was undisputed that the injuries for which Mr. Hoffman sought treatment the day after the incident were sustained, if at all, while he was in the process of performing his job, at his place of work, during work hours, *i.e.*, in the course of his employment. As to the causation element, it would not matter whether the appellant's actions against Mr. Hoffman were willful or merely negligent. Either way, he would have suffered an "accidental personal injury" within the meaning of the Act, and that would entitle him to workers' compensation benefits.

19

By contrast, in the appellant's criminal trial, to prevail on the charge of second-degree assault, of the battery type, the State was required to show that the appellant "caused offensive physical contact with, or harm to" Mr. Hoffman *and* that "the contact was the result of an *intentional or reckless* act of the [appellant] and was not accidental[.]" *Nicolas v. State*, 426 Md. 385, 403-04 (2012) (emphasis added). Thus, while testimony by Mr. Hoffman showing an intentional or reckless act by the appellant was essential to establish criminal liability for battery, testimony that the appellant acted negligently would suffice to establish that Mr. Hoffman sustained an "accidental personal injury" for purposes of a workers' compensation claim. Because Mr. Hoffman could prevail in a workers' compensation claim if the appellant acted negligently and irrespective of whether the appellant acted intentionally, he would not have a financial motive to testify that the appellant intentionally hit him with his pickup truck.[11] The complaining witnesses in the cases the appellant relies upon, and in *Barker*, all had financial motives to testify falsely; Mr. Hoffman did not.

As mentioned, defense counsel's only argument on relevancy was that if Mr. Hoffman either had received or were to receive "benefits" from making a workers'

---

[11] It was not necessary for the appellant to be found guilty in the case at bar for Mr. Hoffman to prevail in a workers' compensation case arising out of the same incident. It only was necessary, as a practical matter, for Mr. Hoffman's testimony in this case to be consistent with his testimony in his workers' compensation case. For that reason, the impeachment genre of "interest in the outcome of the case" was involved only indirectly. Also, the burden of proof in a workers' compensation case is preponderance of the evidence, not beyond a reasonable doubt. *See*, *e.g.*, *Baltimore Cnty. v. Kelly*, 391 Md. 64, 76 (2006). Therefore, on the same evidence, Mr. Hoffman could prevail in a workers' compensation claim even if the appellant had prevailed in the case at bar.

20

compensation "report," "that creates evidence of a motive to lie" by "making up going to the hospital and things like that." Mr. Hoffman's testimony that he sustained injuries in the altercation, for which he went to the emergency room the next day, was supported by the hospital records. To be sure, the jury could have disbelieved his testimony, notwithstanding those records. Evidence that the cost of the hospital visit would be paid by workers' compensation insurance would not have had any tendency to show that he was feigning injury, however. It would have tended to show just the opposite: that he suffered injuries for which he was examined and worked up, and further treatment was advised.

As the hospital records show, Mr. Hoffman had his own health insurance through Blue Cross Blue Shield. It is conceivable that, had Mr. Hoffman not succeeded in obtaining workers' compensation to cover his medical costs, he would have incurred expenses such as deductibles and co-pays by using his own health insurance. But no evidence was introduced or proffered to show that. And even if it were, Mr. Hoffman's trial testimony against the appellant would not influence that. A conviction for second-degree assault of the battery type did not require evidence that Mr. Hoffman suffered any physical injury at all. The State had to prove that the appellant "caused offensive physical contact with, *or* harm to" Mr. Hoffman. *Nicolas*, 426 Md. at 403 (emphasis added). Physical injury may be evidence of harm, but offensive physical contact can occur without physical injury.

As noted above, under the Act, payments for medical services are made to the health care providers rendering the care and treatment, not to the claimant. Defense counsel made no proffer that would support a follow-up line of questions about compensation benefits that might be payable to Mr. Hoffman. Nor was there evidence adduced that Mr. Hoffman

21

had missed time from work that would make him eligible for benefits payable to him. (Indeed, he made clear in his testimony that he completed his work at the end of his shift on the day of the incident and went to the hospital after work the next day.) There was no evidence proffered about whether Mr. Hoffman intended to file a civil action against the appellant, which he would be permitted to do under the Act. Defense counsel did not seek to examine Mr. Hoffman on any of these topics outside the presence of the jury. To be sure, "[w]hile counsel need not—and may not be able to—detail the evidence expected to be elicited on cross-examination, when challenged, counsel must be able to describe the relevance of, and factual foundation for, a line of questioning." *Peterson*, *supra*, 444 Md. at 125 (citation omitted).

In short, while there was a factual foundation for the single question at issue in this appeal, there was no foundation for any follow up questions. *See People v. Jones*, 608 N.E.2d 22, 26 (Ill. App. Ct. 1992) (defense could not question the complaining witness about the details of his workers' compensation claim based on the underlying altercation because defense counsel "made no attempt to explain to the trial judge the impeaching evidence he expected to elicit from [the witness] with respect to" the workers' compensation claim and there was no offer of proof "demonstrat[ing] that the excluded evidence [was] positive and direct on the issue of bias or motive to testify falsely, rather than remote or uncertain");[12] *Smith v. State*, 545 S.E.2d 89, 90-91 (Ga. Ct. App. 2001)

---

[12] The *Jones* court commented nevertheless that it "fail[ed] to see how [the witness's] claim for workers' compensation benefits demonstrated his bias or motive to testify falsely against [the] defendant, particularly since such benefits would be available

(continued…)

(although it was possible the ex-girlfriend complaining witness was motivated to testify falsely that the defendant committed armed robbery, instead of shooting her for "personal reasons," given that Georgia law would not have allowed workers' compensation under the latter circumstance, defense counsel "never articulated this reasoning to the trial court, and thus never gave the court the opportunity to adequately consider whether the line of questioning would have been admissible to show bias in this regard"); *State v. Leandry*, 127 A.3d 1115, 1128, 1130 (Conn. App. Ct. 2015) (trial court properly precluded defense counsel from asking the complaining witness "who paid [his] medical expenses and … whether he had filed a workers' compensation claim," because the witness "did not testify to missing work, to filing a workers' compensation claim, or to needing assistance paying any expenses in connection with this incident[,]" and no proffer was made that a workers' compensation claim had been filed or what evidence defense counsel expected to elicit from the witness in response to the proposed line of questioning).

Finally, even if the trial court's ruling was legally incorrect or an abuse of discretion, which it was not, the error would be harmless beyond a reasonable doubt. *See Dorsey v. State*, 276 Md. 638, 659 (1976). The hospital record from the emergency room visit showed, in several locations, that Mr. Hoffman's insurance was through workers' compensation. And the appellant's guilt *vel non* bore no relation to whether Mr. Hoffman could receive workers' compensation benefits related to injuries he sustained. *See*

---

to him regardless of who injured him, so long as he was injured within the scope of employment"—which was undisputed. *Jones*, 608 N.E.2d at 26. In any event, "any *possible* bias or motive to testify falsely was revealed by [the witness's] admission" that he had filed a claim for workers' compensation benefits. *Id.* (emphasis added).

23

*Deloney*, 734 S.W.2d at 9.  To the extent that "the jury's behavior during deliberations"

can be a factor in assessing whether error was harmless, *see Dionas v. State*, 436 Md. 97,

113 (2013), the jurors in this case deliberated for less than an hour before reaching a guilty

verdict and did not ask any questions about a workers' compensation claim.[13]  For all these

reasons we are confident that the court's ruling sustaining the prosecutor's objection to the

single question at issue did not have any effect on the jury's verdict.

> **JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED. COSTS ASSESSED TO THE APPELLANT.**

---

[13] The jury sent one note, asking to "see Mr. Waters' testimony[,]" but before a response could be formulated it announced that it had reached a verdict.